2020 IL App (3d) 200048

Opinion filed June 26, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| ERIC R. JAMESON, | ) | Appeal from the Circuit Court |
| | ) | of the 9th Judicial Circuit, |
| Petitioner-Appellee, | ) | McDonough County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-20-0048 |
| | ) | Circuit No. 18-F-50 |
| COURTNEY R. WILLIAMS, | ) | |
| | ) | The Honorable |
| Respondent-Appellant. | ) | Raymond A. Cavanaugh, |
| | ) | Judge, presiding. |

_____

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices O'Brien and Wright concurred in the judgment and opinion.

_____

**OPINION**

¶ 1    The circuit court entered an order allocating to the petitioner, Eric R. Jameson, primary

parental decision-making authority for educational and healthcare decisions and the majority of

parenting time. The respondent, Courtney R. Williams, appealed, arguing that the court's rulings

were against the manifest weight of the evidence. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On October 22, 2018, Eric filed a petition to establish a parent-child relationship,

parenting responsibilities, and parenting time with A.J. (born September 25, 2017), the child

whom he had with Courtney. In the petition, Eric sought sole decision-making responsibilities and primary residential parent status with majority parenting time.

¶ 4　　　The parties entered into an agreed order on December 18, 2018, under which they would "have shared care, decision making, control and right to direct the secular and religious education of [A.J.] on a temporary basis." They also temporarily agreed, *inter alia*, to follow the advice of the minor's primary care physician if they could not agree on any healthcare decision. Regarding visitation, they agreed to alternate weeks with the minor. While Eric was working during the week, Courtney, who was unemployed, would have the minor between 8 a.m. and 4 p.m. Additionally, they agreed that no right of first refusal would exist for the other parent if one parent was unable to exercise his or her scheduled parenting time. In addition, the parties also agreed to a mutual stay-away order.

¶ 5　　　One day later, Courtney filed a response to Eric's petition, as well as a counterpetition, which sought, *inter alia*, sole decision-making responsibilities and a majority of the parenting time.

¶ 6　　　During the pendency of the petitions, the acrimonious nature of the dispute became evident. The parties filed for orders of protection against each other. At one point, the circuit court had ordered the parties not to communicate unless an emergency arose with the minor. The court also ordered exchanges to occur in the McDonough County Sheriff's Department lobby. Courtney had relocated to Springfield, causing Eric to file a petition to contest that relocation. Additionally, in June 2019, Eric filed a petition to enforce the temporary order of December 2018, alleging that Courtney had withheld the minor from Eric for scheduled visitations and failed to adhere to requirements for exchanges.

¶ 7    On October 9, 2019, Eric filed an emergency petition to modify parenting time and parental responsibilities. He alleged, *inter alia*, that Courtney was now living in a dry cleaning business in Macomb that did not have a bathtub, shower, or kitchen; that Courtney's mother had expressed to Eric concerns about Courtney's mental health "due to witnessing instances of verbal abuse and threats made against the child's well-being"; and that Courtney had unilaterally decided to cancel an appointment for the minor with her primary care physician and scheduled an appointment with another doctor. Additionally, Eric expressed concern about the minor's hygiene while in Courtney's care, as Courtney had returned the minor to Eric after a six-hour visit in the same diaper that the minor was wearing at the initial exchange, in improper clothing, with permanent marker on the minor's body, and with a full diaper with rash on multiple occasions.

¶ 8    The circuit court held a hearing on Eric's emergency motion and entered an order on November 5, 2019, in which Eric was "allocated significant decision-making authority" and a majority of the parenting time. Courtney was given parenting time during Eric's work hours on Monday through Friday from 8 a.m. to 4 p.m., as well as alternating weekends on Saturday from 8 a.m. to 4 p.m. and on Sunday from 8 a.m. to 4 p.m. The court also ordered Courtney to obtain a mental health evaluation by December 2, 2019. Courtney did obtain that evaluation, which was unremarkable.

¶ 9    The circuit court held a bench trial in December 2019 at which Eric had representation, but Courtney proceeded *pro se*. Eric called several witnesses whom he knew personally through his job as a funeral director and his role as the McDonough County coroner. Generally, these witnesses testified that Eric's residence was clean and appropriate and that he was a good parent. None of these witnesses had seen any inappropriate parenting by Courtney. One of these

3

witnesses, a business partner at one of the funeral homes that Eric owned, testified that he and Eric did not have a regular schedule and would have to answer calls to remove remains at irregular hours.

¶ 10　　　　The remaining witnesses were as follows. Eric testified on his own behalf, and he also called the minor's primary care physician. Courtney testified on her behalf, and she also called her friend, Candace Bainter. For continuity, the testimony of these witnesses will appear mostly in relation to particular topics, rather than strict chronological order.

¶ 11　　　　Eric testified that he lived in Macomb in a three-bedroom house and was 49% owner of a company that ran funeral homes in Macomb and Bushnell. He was also in his third term as the McDonough County coroner. In that role, he was involved in approximately 250 cases per year in which investigations were performed into the circumstances surrounding deaths. Approximately 100 of those cases required him to be at the scene. Depending on the circumstances, he could be on the scene for as little as 20 minutes or as long as eight hours or more. In his role as county coroner, Eric had nine deputies working for him who have been able to take late night calls.

¶ 12　　　　In his role as funeral director for the two funeral homes, his usual hours were weekdays from 8 a.m. to 4 p.m. Visitations could also occur on weeknights, but he would typically be home by 8:15 p.m. on those nights. Visitations and funerals would also be held on weekends. Eric did not work all of the visitations. Another employee had been taking most of the calls about deaths during weeks that he had the minor. When he has had to take late night calls, he had been able to secure a sitter—he would call his mother or sister—and the minor would continue to sleep through the night uninterrupted. Since October 23, 2019, Eric had two calls that he had to

4

attend to at night. On both of those occasions, Eric's mother came over to watch the minor, who did not wake.

¶ 13    Eric stated that early on in the life of the case (Eric and Courtney split up in September 2018), Courtney had demanded a right of first refusal when he had to take late night calls. He tried accommodating that request, doing so on four or five occasions. However, doing so required waking the minor and transporting her to Courtney.

¶ 14    At times, Eric would bring the minor to work with him, including times when Courtney did not show up for the morning exchange and instead dropped her off with Eric at his workplace. Going forward, he expressed a desire to have the minor attend daycare while he was at work. He had also contemplated using an *au pair* or live-in nanny to help with times that he would have to take calls at night. Alternatively, he would continue to use family members to care for the minor at those times. In addition, he testified that he also had several babysitters that he used at other times.

¶ 15    Regarding Courtney's living situation post-breakup, Eric testified:

    "Initially, she had moved or was staying at her former
    stepfather, Scott Collins' place here in Macomb, and then from
    there, she went and moved in with her friend, Mercedes Seitz.
    Mercedes and her [*sic*] had a falling out of some sort, and she was
    asked to leave there. Then she went to an apartment, I believe, on
    Maple Avenue here in Macomb. From there, she went and stayed
    in a hotel for a period and then with her friend, Anna, at a trailer
    park here in Macomb, and then she went and lived in Springfield
    with her mom. Before she went with her mom, she stayed at—she

5

rented a house on Dudley Street. Stayed there for just a couple days and then left and went to Springfield and then came back and was with her friend, Anna. She lived at her former business at the dry cleaner, and then now *** she has an apartment now somewhere here in town."

Eric stated that his concerns with the places in which Courtney had lived were due to there not being any dedicated space for the minor, including the dry cleaning business, which lacked kitchen and bath facilities and had just one room at the back in which Courtney stayed with her son and the minor. On cross-examination, Eric acquiesced that that the hotel stay occurred before the residence on Maple Avenue. When Courtney testified, she stated that she had four residences, not eight, as she did not actually move into four of the aforementioned places. The circuit court noted that, at the hearing on Eric's emergency petition, Courtney had said that she had eight residences post-breakup.

¶ 16        Eric also testified that Courtney had withheld the minor from him on numerous occasions. He alleged that he saw the minor only for a few hours on Christmas in 2018, that Courtney withheld the minor from him on Easter in 2019, and that he did not see the minor at all on July 4, 2019. On Memorial Day weekend in 2019, Eric's sister came to town from Chicago, and Courtney did not show up for the regularly scheduled exchange on that Friday. Courtney did not respond to Eric's attempts to contact her. In the Spring of 2019, Eric's family was having a weekend reunion approximately eight hours away. He asked if she would be willing to allow him to take the minor on Thursday instead of Friday so he could break up the long drive because the minor had not been on a car ride that long. Courtney did not respond to Eric's attempts to contact her. She also did not show up on Friday to the regularly scheduled exchange.

6

¶ 17    During cross-examination, Courtney asked Eric whether he withheld the minor from her between June 10 and 14, 2019. Eric admitted that he had secured other childcare at that time, which was his week, because Courtney had been withholding the minor or showing up late for exchanges, the latter of which had been causing Eric to be late for work (at that time, Courtney had what Eric described as the option to watch the minor during his weeks while he was at work). He also claimed that he had told Courtney he would be arranging for alternate childcare. Courtney indicated that she had withheld the minor from Eric following that incident "[t]o make up my time from the time he took her from the 10th to the 14th." Eric then stated that following that time period, Courtney had the minor for three weeks straight—two of her regular weeks plus one of Eric's weeks.

¶ 18    The minor's primary care physician testified that the minor had not been brought in for her routine well-child checkups between 10 days after her birth in September 2017 and October 2018. Three appointments had been canceled, and one appointment was a no-show. The October 2018 appointment was not a routine well-child checkup. The minor was behind on vaccinations.

¶ 19    Eric testified about an incident that occurred on November 26, 2019, at an appointment with the minor's primary care physician. The minor was due for immunization shots. While in the room, the minor woke up and was upset. Courtney began to breastfeed the minor to soothe her. Eric asked when breastfeeding was going to stop, and Courtney "immediately got defensive." Eric said he was just asking, as Courtney had indicated to him that after two years, there was no nutritional benefit to breastfeeding. Courtney said Eric was stupid and did not understand breastfeeding. She stood up and yelled at Eric. He took his iPad from Courtney, which upset her even more. Eric said that the doctor's office was not the place to argue, and Courtney took the minor and left. Later, Courtney testified that Eric had taken the iPad from her

7

and then threw it. She also claimed that Eric had threatened to get the minor's primary care physician to state that Courtney was no longer allowed to come to the minor's appointments.

¶ 20    Based on testimony elicited during cross-examination of Eric, paternity had not been established yet, such that he did not try to make medical appointments for the minor. He also expressed that "if I went to the Courts and asked for something, I don't think that would have been good for our relationship so *** I guess I never considered that. I begged and asked you many of [*sic*] times to take her and you adamantly refused." He believed that Courtney did not take the minor to the doctor because she did not want her to be vaccinated. Courtney later testified that the minor had been vaccinated by the time of the hearing.

¶ 21    Regarding the minor lacking timely immunizations, Eric testified that during the months Courtney was living in Springfield, she had taken the minor to see a different doctor. The minor's primary care physician had asked Eric if they were changing doctors. When Eric asked Courtney about it, "she said she can do whatever she wants." Eric stated that Courtney had taken the minor to another doctor in Springfield at another time as well. As a result of the confusion, the two practices in Springfield "decided they were going to halt until they had some legal direction on where to go with her treatment."

¶ 22    Eric stated that he had concerns about Courtney's mental health, claiming that "[w]hen [she] gets upset about something, it seems as if she's unable to control her emotions and what she'll say, and she'll say anything and do anything to hurt whoever it is she's upset with and say things that are completely untrue to anybody." He stated he was still seeing, on an individual basis, the counselor that he and Courtney had been scheduled to see for couples counseling. He admitted on cross-examination that he originally went for anger management, as both Courtney and his sister had told him that he should seek help with managing his temper, but that the

8

counselor had stated it appeared his issues were between him and Courtney. Thus, Eric made the appointment for a couple's session, but Courtney refused to go.

¶ 23   Eric further stated that he knew several members of Courtney's family and that he has granted the maternal grandmother's requests to see the minor. He said he had never denied any such requests by her family. He also "always allowed" Courtney's requests to have additional time with the minor, with the exception of one last-minute request Courtney made that conflicted with plans Eric had already made.

¶ 24   Regarding parenting time, Eric alleged that since October 23, 2019, Courtney had declined to exercise parenting time with the minor five or six times on weekdays, had not exercised any parenting time on weekends, and tended to inform him at the last minute about it. During those times, Eric had obtained babysitters, including his mother and sister, to watch the minor while he worked. He also alleged that exchanges had been going well the past couple months, but prior to that, Courtney tended to arrive when she wanted to, which was "never usually right on time." She had also allegedly refused to meet at the police station for exchanges. After the circuit court sustained a foundation objection, Eric gave an example of a time when he had an important meeting and had requested her to meet at 7:30 a.m. rather than at 8 a.m. Courtney declined, and Eric said he "needed to know the night before whether she could be there at eight or not *** and if she wanted [the minor]." Courtney did not respond. Eric texted her that if she was not going to be there, he had to find childcare. The next morning, Courtney came to the funeral home and asked for the minor—"[s]he indicated to me that she had right of first refusal and had until eight o'clock each morning to make that right of refusal." Eric had already arranged for a sitter because he had not heard from Courtney. In response, Courtney called the police and then the Federal Bureau of Investigation.

9

¶ 25      Eric then gave a second example of an issue with exchanges—an incident that occurred outside his workplace during the winter of 2018. Courtney had left Eric's workplace with the minor, who vomited while in her car seat during the ride. Courtney returned to Eric's workplace and "demanded that I change out her car seat for my car seat." He told her that he had to meet with a family that morning, so he did not have time to take care of the situation. Courtney demanded again that Eric swap out the car seats and threatened to call the police. She did in fact call the police. Eric stated that the end result was him "coming out and taking [the minor] from Courtney and changing her clothes in the funeral home keeping her the rest of the day. I just took the day off of work."

¶ 26      Regarding the car seat incident, Courtney testified that the minor had been sick all week during Eric's week. She had gone to Eric's residence to help take care of the minor on Saturday. On Monday, she had a work function to attend, so Eric kept the minor with him at work for the first few hours of the workday. Courtney arrived and breastfed the minor at Eric's work and then placed the minor in the car seat in her car. Courtney then drove to a Verizon store because her phone was not working. The minor vomited when Courtney arrived at the Verizon store, so she immediately returned to Eric's work and asked him to swap car seats. Eric refused, stating that he did not want Courtney ruining the car seat he had. She then told Eric he had to take the minor, then, because she needed to go get her phone fixed. Eric refused, saying that he had to meet with a family at work, and he walked away. She then said she did not want to exercise her right of first refusal at that time.

¶ 27      Eric commented that "there's instances where she doesn't show up, there's incidents where she just brings her in the middle of the workday without notification, and she's constantly calling the police on me because I'm not doing whatever it is she's asking me to do at that time."

10

Eric later admitted on cross-examination that he had initiated more than two dozen police reports himself related to issues with exchanges.

¶ 28    Regarding schooling, Eric stated that he would like the minor to attend preschool at age three at St. Paul's; however, Courtney was "not too keen on that" so he would ask her if she had an opinion on where she wanted the minor to go. Eric had also inquired with a multi-child daycare in Macomb, as he wanted the minor to be able to interact with other children. On cross-examination, Courtney stated, "So you testified that you want her to go to a paid daycare. So you think it's better for her to be watched by a paid stranger than her mother all day?" Eric responded, "[i]n this situation, yes." He clarified by stating that he believed daycare was a better option for the minor "[b]ecause of the instability she has with you."

¶ 29    On cross-examination, Eric admitted that, in January 2018, he had an argument with Courtney in his residence. Courtney, who was holding the minor, went into the bathroom and shut and locked the door. Courtney asked if Eric kicked the door down,[1] and he said no, that he pushed the door. The door had been broken for years and the frame, which had been glued, broke when he pushed the door. He said that "[i]t did not take much for me to push that door in." He also admitted that he broke a plastic toy gun in September 2018 in the room of Courtney's son. He had asked the children numerous times to stop playing with the toy gun, and when they retrieved it again, Eric broke the toy gun in two and cut his hand.

¶ 30    Eric also admitted on cross-examination that he had bruised Courtney's leg in November 2016. Regarding the bruising, Eric was interviewed by the state police two years after the

_____

[1]Courtney testified later that she had closed and locked the door and that Eric had kicked the door down.

incident took place, although Courtney had intimated to the police that the incident had recently occurred. When the bruising occurred, Eric and Courtney were having a discussion about some checks that Courtney had bounced at places in Macomb that were owned by friends of Eric. During the discussion, he poked her leg five times with his finger while saying "you can't do this s***." Eric admitted that his behavior was inappropriate. He also stated that he had apologized for it and regretted it. Courtney testified that she was lying in bed and Eric was standing over her during the argument, which she thought was about a basement remodel as opposed to bounced checks. She then stated:

> "[H]e just started banging on my leg, and it was violent. It was not—I remember it, literally, made me freeze where I was at. It hurt so bad. Like, I was just frozen and then I got up, and it was so deep in my muscle that I physically felt the bruise. Like, when I walked, when my muscle moved, and it was stinging, it stung. I couldn't lay on that side. And he came up and said he apologized, like, an hour later."

She also claimed that she told other people about the incident, even though Eric had alleged that she did not tell anyone else.

¶ 31 Eric also admitted that in March 2017 he pushed over a shelf out of frustration during an argument with Courtney in her son's room. He had asked her to leave several times, but she refused and "was threatening me and taunting me." When he pushed the shelf, it fell over and broke numerous items. Neither of the children was in the home at the time.

¶ 32 Courtney presented the testimony of her friend, Candace Bainter, who testified that Courtney was a good parent to both her children. She also believed the dry cleaner at which

Courtney had been living was appropriate for children, as it had beds, a refrigerator, and a bathroom. When asked on cross-examination about the living space at the dry cleaner, Bainter stated that she could not recall if the bathroom had a shower or if there was a full kitchen.

¶ 33    Bainter also testified regarding an incident at a pool that occurred in July 2019. Eric showed up to pick up the minor, and he was upset because the minor was wet from swimming. Eric was angry and screaming at Courtney, which caused a scene. Courtney did not yell at Eric during the incident. On rebuttal, Eric denied yelling at Courtney at the pool.

¶ 34    Bainter further testified that in August 2019, she heard Eric yelling and using profanity at Courtney over the phone from across the room. In addition, Bainter stated that during the summer months of Courtney's pregnancy, she observed a bruise on Courtney's arm that appeared to be in the shape of finger marks.

¶ 35    Courtney testified that she had been living in a four-bedroom apartment since November 8, 2019. Her lease was for one year. Her son from another relationship was 11 years old at the time of the hearing. Regarding Eric's allegations of her tardiness, Courtney claimed that Eric had a "Type A personality" that predisposed him to controlling behavior and frustration with time schedules. Courtney believed Eric was "greatly exaggerating" her tardiness, as he would get extremely frustrated even if she were one minute late. She stated that she had worked hard to put the minor first and that Eric's claims of tardiness and instability were inaccurate.

¶ 36    Courtney claimed Eric was abusive from the very beginning of their relationship and that everything had to be done his way. He got upset quickly, had a bad temper, and yelled to the point of getting red-faced, including while in the minor's presence. She emphasized that his sister had told him that his temper was "over the top." His temper showed improvement for about a month-and-a-half after he addressed it in therapy, but he stopped going so it got bad

13

again. She further alleged that in September 2018, during a day on which she was breastfeeding the minor while sitting on the ground, Eric became mad and kicked at her face to the point where his shoe was an inch or two from her face.

¶ 37    Courtney also alleged that in March 2017, while she was pregnant, she and Eric had an argument about which last name to give the minor. She said that "[h]e grabbed me from both arms and pushed me toward the door, like, sort of, like, get out of my house, and—but it was a violent push. It made me physically go into the door, and the door handle hit my stomach." He also "clean swiped" items from a shelf. She introduced into evidence two pictures of bruises to her arms[2] and a picture of her son's belongings on the floor next to two bookshelves. On rebuttal, Eric stated that he knocked a shelf down. He denied throwing Courtney into a door.

¶ 38    Courtney also attempted to introduce pictures of a jewelry organizer that she alleged Eric had broken in July 2016. The circuit court did not allow them into evidence, however, because they predated her pregnancy and did not show an act of domestic violence, but only a potential "act of domestic criminal damage of some kind."

¶ 39    Courtney claimed that Eric smoked marijuana multiple times per day, every day, for three years. She believed he did it to ease anxiety. She also testified that she had witnessed him use opioids recreationally on several occasions. On rebuttal, Eric denied using marijuana three times per day—he stated he used it approximately once per week when he mowed his lawn. He also said he had not used it since around Halloween and never used it around the minor. He also denied taking opioids recreationally.

---

[2] Courtney stated that these bruises were the ones Bainter had referred to in her testimony.

¶ 40     In addition, Courtney testified that Eric talked her into signing the temporary parenting time agreement (which set up the week on, week off schedule) by telling her that he would voluntarily give her the minor every night. She claimed that Eric only wanted a 50/50 split on paper, and not in practice, because he knew the more overnights he had, the less child support he would have to pay. She stated, "[h]e only wanted her in the evenings. He'd let me have her all night from eight until four p.m. the next day, and then a lot of times, when he had visitations or that wasn't even—and then sometimes I had her just 24 hours a day for months."

¶ 41     Courtney also alleged that Eric had threatened to kill her in August 2018. They were in the middle of an argument, and while Eric was holding the minor,

> "he just put his forehead against mine and was, like, shaking and said I'll kill you, and I think he whispered it because I think [my son] was in the other room, and he said—we were talking about breaking up, and he said I'll kill you and they'll never find your bones because I'm—I don't think he said because I'm the coroner, but he said something going into that that's what he does for a living, and that was that."

¶ 42     At the close of the hearing, the circuit court ruled that, based on credibility, it was in the minor's best interest to grant Eric primary decision-making and the majority of parenting time. In so ruling, the court briefly discussed the applicable statutory factors and found, *inter alia*, that (1) the parties were both physically healthy enough to parent the minor, (2) the allegation of physical abuse related to Courtney's bruised arms took place before the minor was born, (3) the parties both needed to do a better job of fostering a relationship between the minor and the other parent, (4) it was bothersome that Eric smoked marijuana, but doing so was going to be legal in a

15

few days anyway, (5) there was no corroboration of the specific allegations of drug use by Eric that Courtney had alleged, and (6) Courtney's housing situation was unstable.

¶ 43     The circuit court issued a written order on December 30, 2019. The court allocated to Eric the right to make significant educational and healthcare decisions for the minor. Joint decision-making was ordered for religion and extracurricular activities. Daily and emergency decisions were to be made by the parent having physical possession of the minor at that time. Regarding parenting time, Eric was named the majority parent and was given all parenting time not allocated to Courtney, who was given alternating weekends from Friday at 6 p.m. through Sunday at 6 p.m. and alternating weekdays from Wednesday at 6 p.m. through Friday at 6 p.m. Specific provisions were also made for holidays and the summer. In addition, a right of first refusal was ordered if one parent wanted to leave the minor overnight with a substitute childcare provider. However, no right of first refusal was ordered if Eric chose "to utilize one of his parenting time weeks to allow the minor child to visit with his family, even if he [did] not accompany the minor child for that week."

¶ 44     Courtney appealed.

¶ 45                                    II. ANALYSIS

¶ 46     Courtney's first argument on appeal is that the circuit court's allocation of parental responsibilities was erroneous. Specifically, she argues that the evidence overwhelmingly favored her regarding significant decision-making responsibilities for school designation and healthcare decisions.

¶ 47     A circuit court "shall allocate decision-making responsibilities according to the child's best interests." 750 ILCS 5/602.5(a) (West 2018). In arriving at that decision, the court must consider all relevant factors, including:

16

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2018).

A reviewing court will not disturb a circuit court's ruling on the allocation of decision-making responsibilities unless that decision is against the manifest weight of the evidence. *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64. "A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence." *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51. The circuit court is not required to make explicit findings on each factor, nor is it required to refer to every factor. *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991).

¶ 48 In arguing that the circuit court's decision was against the manifest weight of the evidence, Courtney emphasizes that (1) she was a full-time stay-at-home mother, which rendered her better equipped to address the minor's needs given the nature of Eric's jobs; (2) the minor would get upset when Eric would scream at Courtney; (3) she was still breastfeeding the minor;

18

(4) her housing situation was stable; (5) Eric's witnesses had nothing negative to say about her parenting; (6) Eric used drugs; (7) her mental health examination was unremarkable; (8) the court failed to properly account for the threat of domestic violence from Eric; (9) historically, she took care of the significant decisions related to the minor; (10) Eric preferred substitute care for the minor over Courtney; and (11) she had another child whom she was parenting successfully.

¶ 49 The evidence in this case clearly showed that the parties had a toxic relationship and that both Eric and Courtney were responsible for some questionable decision-making. Nevertheless, as the court noted, both parents appeared fit to care for the minor. Significantly, most of the testimony presented by one side was contested by the other, including whether Eric had substance abuse issues and the extent of Eric's temper. Moreover, while we in no way intend to minimize the importance of the allegations of physical abuse by Eric, we note that most of the evidence in this regard was also conflicting. The only portion of that evidence that was not in dispute was the incident in which Eric poked Courtney's leg and caused bruising. However, that incident occurred before Courtney was even pregnant, Eric had shown remorse for his actions, and Courtney apparently attempted to portray that incident to the police as occurring two years later than it actually occurred. Further, we see no error in the circuit court's finding that Courtney's housing situation was still unstable, as she had only been in her new apartment for just over a month at the time of the hearing. Additionally, we note that there was no dispute that Courtney had borne the bulk of responsibility for failing to secure routine wellness checkups for the minor or that Eric had been able to secure adequate childcare for the minor during times when he was needed for work.

¶ 50 It is no small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence. *In re Marriage of Agers*, 2013 IL

19

App (5th) 120375, ¶ 25 (holding that in this type of case, "there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child"). Significantly, in this case, the circuit court found that Eric was more credible than Courtney. We note that the circuit court is in the best position to evaluate the credibility of witnesses (*Young*, 2018 IL App (4th) 170001, ¶ 64) and that Courtney has not provided a compelling argument to show that the court's credibility determination was erroneous.

¶ 51    It is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence. *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992). Courtney's argument on this issue is more in the nature of an attempt to force this court to reweigh the evidence and reassess witness credibility, which we will not do. It is clear that the circuit court in this case thoroughly reviewed the applicable statutory factors in assessing the evidence. Under these circumstances, we hold that the circuit court's ruling on decision-making responsibilities is not against the manifest weight of the evidence.

¶ 52    Courtney's second argument is that the circuit court's allocation of parenting time was erroneous. Specifically, she argues that the applicable statutory factors weighed in favor of her receiving the majority of the parenting time.

¶ 53    A circuit court must allocate parenting time according to the best interests of the child. 750 ILCS 5/602.7(a) (West 2018). In arriving at that decision, the court must consider all relevant factors, including:

"(1) the wishes of each parent seeking parenting time;

20

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

21

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.7(b) (West 2018).

A reviewing court will disturb a circuit court's ruling on parenting time "only if it is against the manifest weight of the evidence, is manifestly unjust, or is the result of an abuse of discretion." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21.

¶ 54    In arguing that the circuit court's decision regarding parenting time was against the manifest weight of the evidence, Courtney emphasizes that she had been the minor's primary caretaker and essentially repeats the same points she emphasized in her argument regarding decision-making responsibilities.

¶ 55    Again, the majority of the testimony presented by one side in this case was disputed by the other, and we find no reason in the record to disturb the circuit court's credibility determinations. See *Young*, 2018 IL App (4th) 170001, ¶ 64. The evidence indicated that the parties were both fit to parent but had extreme difficulties communicating with each other effectively and adhering to the court order regarding parenting time and exchanges. As in the previous issue, Courtney's argument essentially asks this court to reweigh the evidence and witness credibility. We decline to do so. See *Pfeiffer*, 237 Ill. App. 3d at 513. There is no indication from the record that the circuit court failed to consider any of the relevant statutory factors, or the evidence presented on those factors, in reaching its decision on parenting time.

¶ 56    Lastly, we note that Courtney also contests the circuit court's decision to order a right of first refusal only when one parent wanted to leave the minor overnight with a substitute childcare provider.

¶ 57    Section 602.3(a) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/602.3(a) (West 2018)) provides:

> "If the court awards parenting time to both parents under Section
> 602.7 or 602.8, the court may consider, consistent with the best
> interests of the child as defined in Section 602.7, whether to award
> to one or both of the parties the right of first refusal to provide
> child care for the minor child or children during the other parent's

23

normal parenting time, unless the need for child care is attributable to an emergency." *Id.*

¶ 58 Again, the record reflects no failure of the circuit court to consider the evidence presented on the applicability of the right of first refusal. The evidence clearly showed that the parties struggled with exchanges, especially when Courtney would care for the minor during Eric's parenting time while he was at work. Under these circumstances, we hold that the court did not err when it ordered a right of first refusal only when one parent wanted to leave the minor overnight with a substitute childcare provider.

¶ 59 For the foregoing reasons, we hold that the circuit court's parenting-time decision is not against the manifest weight of the evidence.

¶ 60 III. CONCLUSION

¶ 61 The judgment of the circuit court of McDonough County is affirmed.

¶ 62 Affirmed.

**No. 3-20-0048**

| | |
|---|---|
| **Cite as:** | *Jameson v. Williams*, 2020 IL App (3d) 200048 |
| **Decision Under Review:** | Appeal from the Circuit Court of McDonough County, No. 18-F-50; the Hon. Raymond A. Cavanaugh, Judge, presiding. |
| **Attorneys for Appellant:** | Joseph M. Borsberry, of Borsberry Law Offices, P.C., of Peoria, for appellant. |
| **Attorneys for Appellee:** | Elisa M. Nelson, of Law Office of Nelson & Associates LLC, of Galesburg, for appellee. |