2023 IL App (2d) 220331-U
No. 2-22-0331
Order filed February 15, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF CHARLES L. TATE, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 17-D-1394 |
| YVETTE MACK-TATE, | ) ) ) | Honorable Charles E. Petersen, |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Trial court did not err in granting motion allowing 15-year-old minor child to attend school in Washington, D.C., and reside with his paternal grandmother where evidence showed ruling to be in child's best interests.

¶ 2    Respondent, Yvette Mack-Tate, appeals from an order allowing the minor child of her marriage to petitioner, Charles L. Tate, to attend school in Washington, D.C., and to reside with his paternal grandmother during the school year. For the reasons that follow, we affirm.

¶ 3                                    I.  BACKGROUND

¶ 4    Charles and Yvette were married in Knoxville, Tennessee, in 2005, and relocated to Elgin, Illinois. They have one child, B.T., born in 2007.

¶ 5    In 2017, Charles filed a petition for dissolution of marriage. Two days later, he filed an Emergency Petition for Interim Parenting Time alleging that Yvette had been guilty of repeated and consistent mental and physical cruelty toward their son.

¶ 6    Following a hearing Charles was awarded exclusive parenting time and allowed to remove B.T. from the marital residence to live with him in a separate residence. Yvette was permitted parenting time twice a week for two hours, plus daily telephone contact. Subsequently, by agreement of the parties, Yvette was given additional parenting time over the Christmas holiday. B.T. and both parents were to continue with therapy. Subsequently, in mediation, the parties agreed to a joint allocation of parenting responsibilities regarding all major decisions involving B.T.'s medical and health care, education, childcare, religion, and extracurricular activities.

¶ 7    In February 2018, Yvette filed a petition to modify parenting time, seeking 50% parenting time with B.T. The court continued the petition to modify parenting time and allowed her petition for leave to file a counter-petition and response to Charles's petition for dissolution of marriage. The court also appointed Dr. David Lind to make recommendations on expanding Yvette's parenting time. In April 2018, Philip Lengle was appointed as guardian *ad litem* for B.T. regarding parenting time. In December 2018 the court ordered Dr. Ronald Dachman to act as the family counselor/parenting coordinator. Between April 2018 and April 2019, the court conducted *in camera* interviews with B.T. and entered orders substantially extending Yvette's parenting time.

¶ 8    On September 4, 2019, the courted entered a final parenting plan and judgment. Among its provisions were the parties' agreements that they "will make all major decisions jointly *** regarding the minor child's education, religion, medical and extra-curricular activities"; the child

"shall continue to attend the public school in Charles's school district"; and "any extensive travel (more than a weekend) away from home without either parent shall be agreed to by the parties[, who will] notify one another of any overnight without either parent." The parenting plan and judgment also provided that '[i]n the event there is a disagreement on an education decision, the parties will follow the disputing teacher's recommendation until the party who disagrees petitions the Court."

¶ 9    On July 30, 2020, Charles filed a motion to modify parenting time and for other relief, alleging that a substantial change in circumstances had occurred. In support of his allegation, Charles cited a June 12, 2020, DCFS investigation indicating credible evidence of abuse and neglect; Yvette's failure to attend counseling with Dr. Dachman as ordered under the September 4, 2019, parenting plan; and the recommendations of Dr. Dachman and Tammy Walker, the child's therapist, that Yvette's parenting time be suspended pending a psychological valuation to identify appropriate treatment and subsequent parenting time for Yvette, along with the agreement of Mr. Lengle, the guardian *ad litem*, that a modification of parenting time was appropriate. Charles also described a "pattern of irrational intentional mind games which cause [B.T.] emotional turmoil."

¶ 10   In September 2020, the court suspended Yvette's parenting time pending a hearing.

¶ 11   In October 2020, Yvette filed a response to Charles's motion, noting that both parties were required to work with Dr. Dachman and stating that, on the recommendation of Dr. Dachman, she was seeing a different therapist. She also alleged that Ms. Walker had been terminated recently by her "Clinical Director and employer *** for unethical behavior concerning [B.T.] and violation of HIPPA laws."[1] She admitted that the DCFS investigation occurred but asserted that the report

_____

[1] Asked about this allegation two years later at the hearing on Charles's motion to register B.T. at St. John's, Lengle, the guardian *ad litem*, explained that Walker was a private practitioner

indicated for "mental injury," not credible evidence of abuse and neglect, and that she was appealing the indication.

¶ 12　The trial court ordered Yvette to undergo a Rule 215(a) (Ill. S. Ct. R. 215(a) (eff. Jan. 1, 2018)) mental health evaluation, which Dr. Marc Drummond performed. In his report, released in January 2021, Dr. Drummond diagnosed Yvette with obsessive-compulsive disorder. He opined that she had persistent patterns of preoccupation with control of others, excessive devotion to work, and inflexibility with regard to values; she can be stubborn and rigid, and has a preoccupation with rules mostly of her own making.

¶ 13　Thereafter, Yvette filed a petition for reunification therapy with B.T. A hearing was held on March 30, 2022. After summarizing the testimony in detail, the court found that Yvette had little credibility; the parties needed professional assistance, and Charles was "a credible witness who has the child's best interests at heart." The court denied Yvette's request for physical parenting time without supervision and ordered Charles to provide her with B.T.'s telephone number for reasonable contact.

¶ 14　On July 21, 2022, Charles filed a "motion for school registration" to enroll B.T. in St. John's College High School in Washington, D.C. The motion stated that B.T. wished to attend the school; that he would remain a resident of Elgin, Illinois, but when school was in session would reside with his grandmother, who lived close to the school; and that Charles would be present in Washington, D.C., "a minimum of one-half of the time" but would continue to reside in Elgin. The

---

seeing B.T. at a clinic when Yvette filed a complaint about her. An investigation ensued, with a representative of the clinic concluding that it would be best for B.T. to continue therapy with Walker due to their rapport and history together.

motion further noted the suspension of Yvette's physical parenting time and the lack of any progress towards rehabilitating the relationship between her and B.T. since the court's March 30, 2022, order.

¶ 15     In response, Yvette filed an emergency petition to return B.T. to Illinois and enroll him in Bartlett Academy High School. The motion was granted. She also filed a motion to strike and dismiss Charles's "complaint," alleging that the trial court lacked subject matter jurisdiction because it is limited to enforcing the terms of the parties' final parenting judgment entered in September 2019. The trial court denied this motion and took the matter under advisement, directing B.T. to continue to attend Bartlett Academy High School pending the court's ruling. On August 16, 2022, the court conducted a full evidentiary hearing on the cross pleadings.

¶ 16                    Testimony of the Guardian *ad Litem*

¶ 17     At the trial, Philip Lengle, guardian *ad litem*, testified that he has been involved with the case since prior to the entry of the parenting plan in September 2019, and the relationship between Yvette and B.T. has deteriorated since that time. Yvette has resisted the recommendations of the professional involved in the case and, to his knowledge as of this day, has not complied with any of them.

¶ 18     Lengle interviewed both parents, B.T., the grandmother in Washington, D.C., and Dr. Dachman, and had a phone conference with Tammy Walker. He did not contact anyone at St. John's but reviewed materials regarding the school. The choice to attend St. John's was initiated by B.T. and ultimately made by him. He told Lengle that the athletic department and the academics at St. John's were superior to Bartlett's. Letters submitted to St. John's by Bartlett administrators and teachers indicated that St. John's would be a good fit and a "a great academic opportunity" for B.T.

¶ 19    Therapists Dr. Dachman and Walker both indicated that this would be a "a tremendous opportunity" for B.T. and that they were supporting him in his decision to attend St. John's. Both felt B.T. was "doing very well" socially and academically. Dr. Dachman indicated that Yvette had not reached out to him to schedule any appointments for reunification therapy. Lengle expected that B.T. would be very disappointed if he could not attend St. John's.

¶ 20    Yvette indicated to Lengle that she was against B.T. going to St. John's; it was not in his best interest to go there or to leave Bartlett High School. She had concerns about safety, getting to and from school, the neighborhood, and the crime rate in Washington, D.C. Lengle understood her concerns about the higher crime rate there. B.T.'s grandmother advised him that she could drive B.T. to and from school, "probably" a 10, 15-minute drive. If for some reason she was unable to drive, he could take public transportation.

¶ 21    B.T. initiates phone calls to Yvette three or four times a week. He does not look forward to the calls due to Yvette's negativity and game-playing but makes them because his dad encourages him to and the court's order requires him to. He reported to Lengle that the only negative thing in his life right now is his relationship with his mother. Lengle shared this report with Yvette during his Zoom conference with her.

¶ 22    Lengle is not concerned about B.T.'s ability to maintain telephone contact with Yvette from Washington, D.C. He believes that if she were to consent to his going to St. John's it would be beneficial to their relationship as it would indicate that she was taking his preference into consideration.

¶ 23    B.T. is familiar with Washington, D.C., having been there "numerous" times. His father grew up there and attended St. John's College High School. B.T. and his grandmother have a "very close" relationship.

¶ 24    Lengle's opinion, based on what is in B.T.'s best interest, is that he should attend St. John's for his sophomore year of high school. He thinks it would be an academic step up due to a lower student-to teacher ratio and a high college-acceptance rate. In addition, his dad would stay with him at his grandmother's home at least two weeks of each month, and B.T. would spend summers in Illinois.

¶ 25    On cross-examination, Lengle stated that the grandmother was 80 years old and helps care for her own mother, who is 100 years old and resides 10 minutes away. The grandmother was a former school principal. Although involved with the case since 2017, Lengle did not learn of B.T.'s interest in St. John's until Charles filed the motion in July 2022.

¶ 26    B.T. had a GPA of approximately 3.4 at Bartlett High School's STEM Academy. He took honors classes in math, engineering, English and physics. He has been a good student pretty much everywhere he has attended. Although thriving at Bartlett, B.T. indicated his belief that, academically and athletically, Bartlett was not "really up to snuff."

¶ 27    The parties had agreed that B.T. would attend Bartlett's Academy following the entry of the 2019 allocation judgment. Lengle agreed that the allocation judgment gave Yvette joint decision-making powers regarding school and religion.

¶ 28                          Testimony of Yvette Mack-Tate

¶ 29    Under the existing court orders, Yvette does not have person-to-person parenting time with B.T. Within 24 hours of receiving a communication from Charles regarding B.T.'s opportunity to attend St. John's College High School, Yvette called the Elgin Police Department to do a health and welfare check on B.T. She believed B.T. was no longer in Illinois. She had not seen him since February 2020, and Charles had sent documentation that B.T. was flying to Washington, D.C., on Saturday morning, July 9. She called the police on Friday, July 8.

¶ 30      The Elgin police confirmed that B.T. was not in Illinois, and "with their advisement," she called the Washington, D.C., police. She did not know where B.T. was and worried that he was in danger. Upon further questioning, she testified that she did not call the police because she had been informed that B.T. was getting on a plane to Washington, D.C., on Saturday morning but because she had been informed that he was not in Illinois and she did not know where he was.

¶ 31      B.T. had never expressed a desire to go to school in Washington, D.C., as they never lived there nor agreed to live there. She believes that Charles has alienated her from B.T. and that it has "been proven." She stated that Dr. Finn recently came before the court and testified that "it's one of the worst cases of alienation they'd ever seen."[2] B.T. has been "blocked" from her family since 2019, despite attempts to reach out to him. Yvette has tried to talk with B.T., but their phone calls are ten minutes or less and he will not have a conversation with her.

¶ 32      Yvette last had a conference with Dr. Dachman in October 2019. She testified that Dr. Dachman "was never" a reunification counselor. She agrees that St. John's College High School is a good school.

¶ 33                          Testimony of Charles Tate

¶ 34      Charles was the final witness. He testified that B.T. first expressed interest in attending St. John's seven or eight years ago, talking about it on numerous occasions in both D.C. and Elgin, and in the presence of his mother. During spring break 2020 in D.C., he asked to visit the school. Although the application process was closed at that time, Charles arranged a tour with the alumni

---

[2] Dr. David Finn, a court-appointed evaluator, filed an initial report in 2018 favorable to Yvette, and, nine months later, an addendum strongly favorable to Charles and shifting the allocation of decision-making to him with regard to education, health care, and extra-curricular activities.

association. At the end of the tour, the alumni association representative told Charles he was impressed with B.T. and asked Charles whether they would be interested in applying if there were an opportunity. Charles discussed it with B.T., who was excited by the prospect, and they initiated the application process in early June 2020. No one at the school had told Charles that they could reopen the admissions process for the upcoming academic year. B.T. also signed up for basketball camp at St. John's to begin Monday, July 11.

¶ 35 Charles emailed Evette about the potential opportunity on July 7 or 8, and the next thing he knew he received a phone call from the Elgin police. Neither he nor B.T. were home at the time, but he spoke with the police lady. He received warnings from Yvette not to take B.T. to Washington, D.C. The next day, Saturday, he and B.T. flew to D.C., as planned. On Sunday evening, the D.C. police came to his mother's house, where they were staying. Their visit upset both his mother and B.T., who expressed shock that Yvette would have done this.

¶ 36 B.T. enjoyed the week of basketball camp. On July 15 he was offered admission to St. John's.

¶ 37 Charles's mother lives about 15 minutes from the school; she walks six miles a day and is in great health; she has a valid driver's license and only visits her mother twice a week, although she calls her daily.

¶ 38 Charles works from his home in Elgin, although most of his accounts are based on the East Coast. In the near term, there is no indication he would need to travel to actually see customers if he were in the East, as most of the retailers are "fairly adamant" about virtual contact. B.T. will continue with the same Illinois doctors he has now, and will be able to have the same telephone contact he has had with Yvette for the last couple of years.

¶ 39    Although aware that the allocation judgment gave Yvette involvement regarding educational decisions, he chose not to inform her that he had submitted the application on B.T.'s behalf. The opportunity was "completely not guaranteed"; given the history of Yvette's "interfering and thwarting things," he decided to let the application process move forward based on B.T.'s merits and wishes. Charles will pay the $22,500 per year it costs to go to St. John's.

¶ 40    Crime statistics for Washington, D.C, and a list of sex offenders in the northeast section of D.C., were admitted into evidence on cross-examination.

¶ 41    The trial court determined that it was in B.T.'s best interest to attend St. John's College High School in Washington, D.C. The court relied primarily on the guardian *ad litum*'s testimony. Specifically noting that Yvette's parenting time has been taken away from her, and she has not complied with any of the expert's recommendations for B.T.; on the other hand, the school would be a good fit for B.T., and the relationship between mother and child "could be re-established" by his going to the school. The court also found Yvette "not credible. She has only her best interests at heart contrary to this child's best interest."

¶ 42    The court denied Yvette's motion to return B.T. to Illinois and enroll him in Bartlett High School, and granted Charles's motion for school registration in St. John's. The court's order included Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)) language. Yvette's timely appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44    Yvette argues that the trial court "exceeded its authority because its decision to allow B.T.'s enrollment in St. John's College High School effectively reallocated or terminated her significant decision-making responsibility for B.T.'s education." We will not reverse a trial court's ruling on

the allocation of decision-making responsibilities unless the decision was against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47.

¶ 45 The parenting plan and judgment does give Yvette significant decision-making responsibility for B.T.'s education. It also provides, however, for petitioning the court where there is disagreement on an education issue. See also *IRMO Katsap*, 2022 IL App (2d) 210706, ¶ 125 (where the parties could not agree on choice of school, the determination fell to the court). The trial court did not exceed its authority; instead, it exercised its inherent authority to adjudicate an educational decision where the parties could not agree. See *Katsap*, 2022 IL App (2d) 210706, ¶ 125; see also *In re Marriage of Devick*, 315 Ill. App. 3d 908, 913 (2000) (citing *In re Marriage of Pahlke*, 120 Ill.App.3d 1009, 1014 (1983) (trial court judge in domestic relations division has jurisdiction to hear all issues that are justiciable in nature)).

¶ 46 Still, Yvette contends that the "typical" procedure would have been for Charles to petition the court for modification of the parenting judgment; only if the court found that "a substantial change has occurred in the circumstances of the child or of either parent," could it proceed to an analysis of B.T.'s best interests. See 750 ILCS 5/610.5(c) (West 2020). In addition to citing cases in which modification petitions were filed, Yvette attempts to distinguish *Katsap*, arguing that there the trial court resolved an educational (daycare) dispute contemporaneously with entering a judgment for dissolution of the parties' marriage, whereas here the trial court's educational determination occurred after the parenting responsibilities had been allocated. This is a distinction without a difference since our holding in *Katsap* remains undisturbed: where the parties cannot agree on a matter for which they share responsibility, the determination falls to the court. *Katsap*, 2022 IL App (2d) 210706, ¶ 125.

¶ 47    Yvette also asserts that "post-decree" educational decisions have previously been determined by Charles and Yvette. She points to their agreement to enroll B.T. in the STEM Academy at Bartlett High School, which was reached after the entry of the parenting plan and judgment. This decision, however, was made prior to B.T.'s freshman year of high school and did not contemplate his subsequent strong desire to attend St. John's, the opportunities presented by attendance there, nor the escalating deterioration of his relationship with Yvette, including the reduction of her parenting time to telephone contact only.

¶ 48    The trial court's determination of the education issue did not modify the parenting plan and judgment to take away any of Yvette's decision-making authority for B.T.'s education and did not reallocate any parental responsibilities. It simply resolved a disputed issue that the court had jurisdiction over. Her claim of a lack of findings is at worst harmless error. The record establishes a substantial change in circumstances regarding the feasibility of enforcing the parenting judgment due largely to Yvette's dysfunction and refusal to comply with prior orders of the court. She has not suffered any prejudicial error, if any error at all. B.T., on the other hand would surely suffer if he were forced to attend Bartlett High School for no reason other than to satisfy Yvette's wishes.

¶ 49    Most importantly, the court's decision was not contrary to B.T.'s best interests, as Yvette maintains. The trial court must allocate decision-making responsibilities according to the child's best interests. 750 ILCS 5/602.5(a) (West 2020); *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. In making that determination, the court must consider all relevant factors, including the 15 set forth in section 602.5(c) of the Act. *Jameson*, 2020 IL App (3d) 200048, ¶ 47. However, the court is not required to make explicit findings on each factor or refer to every factor. *Id.*

¶ 50    Yvette claims that the trial court focused solely on the first best interests factor under section 602.5(c), the wishes of the child. The court did emphasize this factor, which requires

"taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making." *Id*. The court's decision stated, "it is clear that this is what the 15 year old [sic] young man wants and he desires, that it is [in] his best interests, and that he should go to the school that has the academics and sports that the child wants."

¶ 51    The record shows, however, that the court also considered many other relevant factors under section 602.5(c), albeit without necessarily referencing them and often by recounting witnesses' testimony related to those factors. The court considered:

> "(2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;
>
> (4) the ability of the parents to cooperate to make decisions ***;
>
> (5) the level of each parent's participation in past significant decision-making with respect to the child;
>
> * * *
>
> (7) the wishes of the parents; [and]
>
> (8) the child's needs." 750 ILCS 5/602.5(c) (West 2020).

¶ 52    The court clearly was concerned that B.T.'s relationship with his mother had deteriorated, noting that he does not want to talk to her and has not had in-person contact with her since November 2021. The court noted Lengle's testimony that Yvette has not complied with any of the expert's recommendations and her parenting time has been taken away from her, as well as his belief that Yvette's relationship with her son could be reestablished if he went to the St. John's. The court noted that Lengle described B.T. as "upbeat, confident and maturing." The Bartlett High School teachers and administrators support B.T.'s transfer to St. John's because it presents an opportunity for B.T. and is a good fit. Dr. Drachman thinks the same.

¶ 53    The court noted that Charles wants B.T to go to St. John's, Yvette does not. The court was not surprised that the parents' positions were "diametrically" opposed. As for B.T.'s needs, he has a close relationship with his grandmother and she provides appropriate housing, transportation, and supervision.

¶ 54    In short, the trial court's determination that attending St. John's College High School is in B.T.'s best interests is not against the manifest weight of the evidence.

¶ 55                              III. CONCLUSION

¶ 56    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 57    Affirmed.