2022 IL App (1st) 210440-U
Order filed February 3, 2022

FIRST DISTRICT
FOURTH DIVISION

No. 1-21-0440

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JOSHUA SAUNDERS, | ) | Cook County. |
| | ) | |
|     Petitioner-Appellant, | ) | |
| | ) | No. 18 D 7500 |
| and | ) | |
| | ) | |
| LISA SAUNDERS, | ) | Honorable |
| | ) | Elizabeth Loredo Rivera, |
|     Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: We dismiss the appeal as to the dissolution of marriage judgment for lack of appellate jurisdiction where the issue of child support had not been resolved at the time of appeal. After finding that we have appellate jurisdiction under Illinois Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016), we affirm the trial court's allocations of parental decision-making responsibility in its allocation judgment where the determinations were not against the manifest weight of the evidence.

¶ 2    Petitioner-appellant, Joshua Saunders, appeals from a judgment for dissolution of marriage (dissolution judgment) dissolving his marriage to respondent-appellee, Lisa Saunders,[1] and from an allocation judgment and parenting plan (allocation judgment), regarding the parties' minor child, M.S., under the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (750 ILCS 5/101 *et seq.* (West 2020)). On appeal, as to the dissolution judgment, Joshua asserts that the trial court erred in ordering him to pay all child-related expenses until Lisa finds employment and awarding Lisa more assets and less debt and maintains that the provisions setting forth the division of the marital estate are unclear, self-contradictory, and without necessary instruction (the financial issues). The dissolution judgment, however, did not resolve the issue of child support but continued the matter for further proceedings. As to the allocation judgment, Joshua argues that the trial court erred in allocating sole decision-making responsibility to Lisa with respect to M.S.'s education and religion and joint decision-making responsibility with respect to M.S.'s extracurricular activities and healthcare decisions. We find that there is no appellate jurisdiction to consider Joshua's challenges to the dissolution judgment where the trial court did not resolve the child support issues and dismiss his appeal from that judgment. We find that we have appellate jurisdiction over the allocation judgment under Illinois Supreme Court Rule 304(b)(6) (eff. March 8, 2016) and affirm the trial court's allocations of decision-making.

¶ 3                                  I. BACKGROUND

¶ 4    Our discussion of the facts will be limited to those relevant to the issues regarding the allocation judgment.

¶ 5                              A. Pretrial Proceedings

---

[1] In the report of proceedings, Lisa is referred to by her maiden name, Lisa Sutherland.

¶ 6    Joshua and Lisa married on June 18, 2011. They have one child, M.S., born on September 10, 2015.

¶ 7    On August 28, 2018, Joshua filed a petition for dissolution of marriage citing irreconcilable differences and sought joint decision-making responsibility for all significant issues. If the parties were unable to communicate and cooperate effectively, Joshua sought sole decision-making responsibility. Lisa filed a response to the petition and a counterpetition seeking joint decision-making responsibility.

¶ 8    At the time the litigation began, Joshua owned and operated, Uncorkd, Inc., and Lisa was unemployed. M.S. (then three years old) began preschool at the Creative Children's Center (CCC) in December 2018. The family lived together in Chicago, Illinois until September 2019 when Lisa and Joshua moved into separate residences in Chicago.

¶ 9    The court appointed Lynn Weisberg as M.S.'s guardian *ad litem* (GAL) on June 17, 2019. As part of her duties, after conducting an investigation, the GAL submitted a report on allocation of parenting time and decision-making responsibility on March 27, 2020 (the report).

¶ 10    On November 19, 2019, the court granted Lisa's counsel's motion for leave to withdraw and Lisa later filed her *pro se* appearance.

¶ 11                              B. Trial

¶ 12    In accordance with safety restrictions imposed during the COVID-19 pandemic, the trial court conducted a six-day trial by videoconference on August 12 and 14, 2020; September 10, 16, and 29; and October 16. Joshua and his attorneys were present, and Lisa appeared *pro se*.

¶ 13    Four witnesses testified at the trial: the GAL, Joshua, Lisa, and Halle Rubin, the executive director at CCC. The court admitted into evidence numerous exhibits including the report and electronic communications between the parties on a system called Our Family Wizard (OFW).

Joshua's counsel waived any beyond the scope objections as to Lisa's examination of the witnesses. The parties stipulated that M.S. would attend the Oscar Mayer Magnet School (Oscar Mayer) for the 2020-2021 school year. A summary of the evidence related to decision-making responsibility follows.

¶ 14                                    1. The GAL's Report

¶ 15    As part of her investigation, the GAL interviewed Lisa, Joshua, M.S., Rubin, two of M.S.'s former teachers at CCC, and the parties' attorneys and reviewed numerous documents including OFW communications between the parties, CCC attendance forms, and literature pertaining to kindergarten and preschool guidelines.

¶ 16    In summarizing her meetings with Joshua, the GAL noted that he felt the marriage began to decline after M.S. was born, once Lisa dissolved her business, banned Joshua's mother from the marital residence, and became isolated. In September 2017, Joshua said that he slept at his office for a period of approximately three months and that he and Lisa maintained their normal routine with M.S. (Lisa reported that he moved out of the home for eight months and only came home one to two nights a week.) In April 2018, he went back to sleeping at the family residence. After the divorce was filed, Lisa moved into the "downstairs bedroom."

¶ 17    According to Joshua, he assumed the "lion's share" of administrative responsibilities for M.S. He scheduled health-related appointments, took M.S. to a majority of those appointments, completed preschool applications, enrolled M.S. in extracurricular activities, and attended almost all of her activities. Joshua described himself as more outgoing and the "backbone" of M.S.'s structure and described Lisa as introverted and spending much of her time engaging M.S. in activities at home.

¶ 18    Joshua informed the GAL that Lisa took M.S. out of CCC early on three occasions in a two-week period. CCC's sign-in records showed that Lisa removed M.S. from CCC before noon on four days between October 4 and November 1, 2019 and two additional days in November.

¶ 19    At a second meeting which was requested by Joshua, he expressed concern about Lisa's alcohol consumption, especially since the onset of the divorce. Joshua contended that Lisa had multiple glasses of wine daily and kept bottles of wine in her bedroom closet. Joshua was hesitant to raise the issue initially because he knew Lisa would become defensive. Joshua admitted that he does not know what occurs at Lisa's current residence. Although concerned, he has chosen not to pursue an independent investigation.

¶ 20    Joshua said that Lisa does not communicate well, and she failed to respond to communications with CCC. Joshua and Lisa have not been able to agree on whether M.S. should attend another year of preschool or begin kindergarten. Joshua believed that Lisa's "imminent" move to the suburbs is motivated by self-interest.

¶ 21    The GAL also met with Lisa. Lisa had operated her own business but scaled back work once M.S. was born. After she closed her business, Lisa felt isolated and pressured by Joshua to return to work.

¶ 22    Lisa planned to stay in Chicago for one more year and desired to move to the suburbs after that. Lisa wanted M.S. to be in a better school district and have the benefits of a neighborhood and yard. Lisa referred to CCC as a "daycare" and expressed dissatisfaction with it. Lisa did not think M.S. enjoyed CCC and for that reason M.S. struggled when separating from Lisa on school days. The GAL noted that CCC had taken steps to improve M.S.'s experience, but Lisa "refused to acknowledge the positive change."

¶ 23    As to taking M.S. out of school early, Lisa admitted that she did so on two days because she missed M.S. She defended her actions by maintaining that M.S. did not miss any substantive activities in the afternoon session, which included lunch, a two-hour nap, and snack time.

¶ 24    Lisa denied having a problem with alcohol. Lisa explained that in September 2019, she purchased six bottles of wine on sale and hid them in her closet because she "didn't want Joshua to drink it." The report stated that Lisa "[i]n responding to Joshua's accusation, *** alleged that Joshua had been prescribed narcotics by his best friend, who is a physician; kept marijuana and a pipe in his nightstand drawer, which M.S. found on at least four occasions in early 2017 and mid-2018; and partied '*hard*' with his friends." (Joshua maintained that he was on properly prescribed medications and that he kept a marijuana and/or pipe in a drawer away from M.S. Joshua denied being a person that partied "hard.")

¶ 25    The GAL had one meeting with M.S., which occurred when Lisa and Joshua were still living together. The GAL described M.S. as a happy child and a "sweet, engaging four-year-old girl." M.S. is bonded with both Lisa and Joshua. M.S. had recently learned of the divorce and did not fully understand the concept.

¶ 26    In summarizing the GAL's interviews with the CCC employees, the report noted that M.S. started at CCC on December 3, 2018 in a classroom with three- to four-year-old children. Around the time of the divorce, M.S. had trouble during the "drop-off" periods. According to Rubin, Joshua made M.S.'s transition easier as he said goodbye more quickly. Lisa would hold onto M.S. for longer periods of time. The longer goodbyes made it difficult for M.S. to engage in the classroom. According to Rubin, Lisa questioned whether M.S. was in the right environment.

¶ 27    In July 2019, Rubin met with the parties to discuss drop-offs and suggested moving M.S. into an older classroom. Within weeks of the transition M.S. began to "blossom," made new

friends, and bonded with her new teacher. Rubin stated that CCC sent pictures and videos to Lisa, but Lisa never acknowledged the progress. Rubin also reported to the GAL that Lisa did not appreciate CCC's afternoon curriculum, which included enrichment centers that featured music, nature, Spanish, and dance.

¶ 28    Rubin stated that Lisa did not inquire as to M.S.'s day and was not involved in the school community. Joshua, on the other hand, attended social gatherings and fundraisers. At the end of the 2019-2020 school year, Rubin sent an email to the parents of the school to see if their children would be attending CCC in the Fall. Lisa responded, copying Joshua, stating that she was leaning toward not re-enrolling M.S. as she felt M.S. would be "bored." Joshua also responded to the email and stated that Lisa was not in agreement, and he could not make a decision until after the divorce.

¶ 29    The parties disputed whether M.S. should attend another year of preschool or move up to kindergarten and disagreed over M.S.'s readiness for kindergarten. Each party gave reasons for their positions. M.S. would be five years old on September 10, 2020. The GAL's research revealed that Chicago Public Schools guidelines for admission to kindergarten require that a child must be five years old by September 1 of the year in which the child wishes to enroll. A child who will turn five between September 2 and December 31 of that year may gain early entrance to kindergarten if they have completed at least one year of preschool and have passed a development survey and a cognitive evaluation. In light of the fact that Lisa was considering a move to the suburbs, the GAL also researched entrance requirements in suburban schools. The Glenview and New Trier feeder schools follow similar guidelines. Glenview allows early entrance for children that are five by September 30 and Northbrook allows for early entrance for children that are five by October 1 with additional assessments.

¶ 30    When the parties were unable to come to an agreement, the GAL suggested that the parties mediate the issue. Lisa responded that she intended to have an independent third party assess M.S.'s readiness for kindergarten, which she never did.

¶ 31    As to religion, the report noted that M.S. was to be reared in the Catholic faith and would celebrate Jewish holidays with Joshua and that "the parties agree[d] that [M.S.] will be given a Hebrew name."

¶ 32    The GAL found that Lisa and Joshua showed agreement on M.S.'s routine healthcare and religion, but that they had an inability to resolve important issues including which grade and school M.S. would attend in the fall.

¶ 33    The GAL expressed that Lisa tended to see issues "through her own lens" and is unable to see how her actions impact others. The GAL believed that Lisa has "difficulty in fostering relationships," which would make it difficult for co-parenting or advocating on M.S.'s behalf. The GAL thought it was problematic that Lisa assumes that M.S. will move to the suburbs with her. The GAL suggested that Lisa relied on Joshua to handle the mechanics for M.S.'s basic needs and pointed out that Lisa failed to follow through on obtaining an independent assessment to determine M.S.'s readiness for kindergarten.

¶ 34    The GAL found that Joshua considers a "wider breadth" of information and has demonstrated a consistent effort to confer with Lisa. The GAL thought that Joshua has a "fuller understanding of [M.S.'s] world" and does not believe that he is inherently right. The GAL believed that Joshua should continue to take care of M.S.'s administrative tasks.

¶ 35    The GAL recommended that Joshua and Lisa have joint decision-making responsibility for religion and routine healthcare decisions. As to decisions regarding education, extracurricular

activities, and non-routine healthcare decisions, the GAL recommended that the parties consult and if they cannot agree, the GAL recommended that Joshua make the final decision.

¶ 36                                    2. The GAL's Testimony

¶ 37    The GAL testified consistently with the report, elaborated on certain points, and provided additional information.

¶ 38    The GAL found M.S. was a good child, had a very close relationship with Lisa, was bonded with Joshua, and was equally affectionate and generally happy with both parents. Lisa and Joshua were both receptive to M.S.'s best interest. To help M.S. during the divorce, the GAL made suggestions including that M.S. attend play therapy. Lisa did dismiss this suggestion, but on cross-examination, the GAL explained that Lisa did not think M.S. had difficulties expressing her emotions and may not benefit from play therapy.

¶ 39    The GAL enjoyed meeting with Lisa, and they had productive conversations. In the GAL's view, Lisa was a devoted mother, trying to make decisions and have a positive co-parenting relationship with Joshua. On occasions, the GAL had problems communicating with Lisa, including a two-week period where she could not reach Lisa.

¶ 40    From March 2020 through the end of the school year, in response to the COVID-19 pandemic, CCC offered classes, via Zoom. The GAL testified that M.S. was participating in the classes five days per week. CCC reported that M.S. participated online with Joshua, but not with Lisa.

¶ 41    On cross-examination by Lisa, the GAL testified that in college she majored in political science and Hebrew studies and studied in Israel during her junior year. In response to Lisa asking if the GAL was biased, she answered in the negative. The GAL explained that to provide an

independent, objective report, her investigation included interviews with collateral witnesses without primary interests in the outcome.

¶ 42    On further cross-examination, the GAL testified that she did not have independent evidence or proof of whether Lisa banned Joshua's mother from the home or whether Joshua lived outside of the residence for three months or eight months. The GAL did not inquire into why Lisa felt M.S. would be bored if she remained at CCC. The GAL's investigation did not include anything that occurred after March 2020.

¶ 43    The GAL also acknowledged that Lisa, in an email to the GAL on November 5, 2019, denied Joshua's allegations in regard to her alcohol consumption and offered to provide evidence refuting these claims. The GAL did not take Lisa up on this offer. Joshua in addition to denying he had a problem with drugs, agreed with the GAL that M.S. should not find drug related items around the house. The GAL did not investigate further and informed the parties that they would need to hire experts. She was only concerned about issues that may affect M.S.

¶ 44    The trial court inquired into whether the GAL did anything additional about the substance use allegations as they pertained to M.S.'s safety. The GAL responded that she asked whether either parent had observed the other under the influence in the presence of M.S., to which the parties responded in the negative. The GAL then testified that Lisa alleged that in 2018 M.S. found marijuana and paraphernalia in Joshua's nightstand and two bottles of prescription drugs in Joshua's backpack. The GAL told Lisa and Joshua that if they chose to engage in recreational drug or alcohol use that they would need to store those items in a place where a child could not find them. The GAL explained that, in her report, she went into more detail explaining Joshua's allegations against Lisa because the timing of the events was more concerning to M.S.'s safety.

The allegations against Lisa occurred while the parties were contemplating imminent separation and the allegations against Joshua occurred during the marriage.

¶ 45                                    3. Halle Rubin's Testimony

¶ 46     At CCC, Rubin oversees the safety, health, and education of the students, manages the curriculum development, and spends a majority of her time interacting with parents. Rubin testified that Joshua has always worked well with CCC, communicating through email and personally at meetings, including parent-teacher conferences. Joshua would check-in with her often, ask her about M.S., and discuss the home situation with her. Rubin stated that "[Joshua] never was afraid to reach out or stop in the—often there was many mornings where he would drop [M.S.] off and then come by to see me and just check in on how she was doing." Lisa communicated with Rubin, but not as much as Joshua. Both parties would raise concerns when there were issues with M.S. Joshua and Lisa, during a parent-teacher conference, informed Rubin of the divorce.

¶ 47     After starting at CCC, M.S. did well. The school day consisted of free play, breakfast, going outside, learning circle, and cognitive centers (math, science, language) in the mornings. The afternoons consisted of lunch, nap, snack, going outside, enrichments (Spanish, cooking, music, dance) "if they are scheduled that day," a "little" interim class, and free play.

¶ 48     When M.S. was having trouble with drop-offs, the school implemented tactics to make it easier for M.S. Rubin noticed that Lisa's drop-offs took longer than Joshua's, which seemed to make the process more difficult. Once inside the classroom, M.S. was not as nervous or sad.

¶ 49     In the summer of 2019, Joshua scheduled a meeting with Rubin to discuss Lisa's desire to take M.S. out of CCC. Lisa was not present at the meeting. The purpose of the meeting was to keep M.S. enrolled at CCC.

¶ 50    At a parent teacher conference in October 2019, Lisa informed Rubin that she wanted to prepare M.S. for kindergarten for the next school year. Joshua wanted CCC to do what they believed was best for M.S. Rubin did not believe that M.S. was ready for kindergarten as M.S. had just transitioned into a new classroom and was getting over drop-offs, making new friends, and getting to know her teachers. Rubin believed that Lisa was expecting CCC to rush the learning process so she could move to the suburbs.

¶ 51    Sometime in 2019, teachers notified Rubin that M.S. was occasionally being pulled early from school or not coming at all. On cross-examination, Rubin testified that some of these times could have been due to the school sending M.S. home due to illness.

¶ 52                                4. Joshua's Testimony

¶ 53    Joshua testified on his own behalf and was also called to testify by Lisa.

¶ 54    Joshua sought sole decision-making responsibility for all significant issues due to Lisa's lack of communication. He would ask Lisa for her input before making decisions.

¶ 55    Joshua maintained that he always lived at the family residence. He slept at his office for a week in September 2017 and again from the end of December 2017 through the second week of April 2018. According to Joshua, Lisa suggested that he sleep away from the home. During this time, Joshua came back after work six nights a week for M.S.'s nighttime routine.

¶ 56    In November 2018, Lisa moved into a room downstairs, which was previously M.S.'s playroom. On questioning from Lisa, Joshua agreed that once Lisa started living in the room downstairs, it was no longer used for a joint purpose. However, Joshua entered the room when Lisa was not present and took pictures of her financial records.

¶ 57    Joshua scheduled most of M.S.'s medical appointments, but both parents usually attended. Two weeks prior to trial, M.S. broke her arm and Lisa took her to the emergency room for care.

Lisa enrolled M.S. in T-ball, which she participated in for a few months. Joshua attended all sessions; Lisa attended some. M.S. took swim lessons at two separate swim schools; Lisa may have enrolled her. Joshua, and not Lisa, attended the ten sessions of the parent-child swim class. M.S. also participated in a gym class, Joshua and Lisa "split" this class.

¶ 58    At the time of trial, M.S. had turned five years old and had attended two schools in addition to Oscar Mayer, the Gardner School of Lincoln Park and CCC. Joshua testified that he primarily completed M.S.'s paperwork and communicated with the earlier schools. Starting in September 2017, he and Lisa began switching off morning routines with M.S. including dropping her off at school. At the beginning Lisa was doing "70, 75 percent" of the pickups and drop-offs and the parties moved "closer to 50/50."

¶ 59    Before attending CCC, M.S. (then two years old) was enrolled in the Gardner School in September 2017. Around February or March 2018, Lisa "pull[ed]" M.S. out of the Gardner School because there were too many children in the classroom. Joshua agreed that the conditions were not great but disagreed as to the timing of withdrawing M.S. Around this same time, one of M.S.'s teachers from the Gardner School left and began an in-home nanny share. M.S. began attending this nanny share four times per week. In late summer 2018, Lisa, without consulting him, decided to send M.S. to the nanny share five days per week. In October 2018, Lisa withdrew M.S. from the nanny share "not in a collaborative manner." On cross-examination, Joshua acknowledged that Lisa suggested that she felt an all-day daycare was too long for a child, but he did not agree.

¶ 60    When M.S. was attending CCC, in July 2019,[2] based on Lisa's concern that M.S. did not like CCC, Joshua arranged a meeting with Rubin. At the meeting, the parties decided that M.S.

---

[2] Joshua's testimony states that the meeting occurred in 2018, however, the entire discussion was based on the "upcoming school year" of 2019-2020.

would be moved up to an older preschool for five days a week. Joshua thought the transition went well.

¶ 61    On questioning by Lisa, Joshua acknowledged that he had meetings with Rubin without Lisa's knowledge. Prior to the July 2019 meeting, Joshua spoke with Rubin in her office and scheduled a meeting to identify solutions to improve M.S.'s situation. Joshua stopped by Rubin's office a couple of times, but not "frequently." Joshua also acknowledged that he had meetings with the GAL without Lisa's knowledge. Joshua does not have first-hand knowledge that Lisa communicated less with M.S.'s teachers.

¶ 62    On further cross-examination, Joshua testified that when CCC switched to remote learning for the final two months of school, live videoconference classes were only held on Monday, Wednesday, and Friday for 30 minutes. This class schedule did not correspond with Lisa's then parenting time (Tuesday, Thursday, and every other Friday). He did not recall the GAL testifying that CCC offered all day remote learning but stated that "[i]f she did, that's incorrect."

¶ 63    At the end of the 2019-2020 school year, in response to CCC asking whether M.S. would attend CCC for the next school year, Joshua emailed CCC stating that he wanted M.S. to remain there but could not make a decision without Lisa. He did not include Lisa on this correspondence, because he wanted to "smooth things over."

¶ 64    Joshua first found out that Lisa was considering sending M.S. to Oscar Mayer in a June 3, 2020 OFW message. Lisa informed Joshua that M.S. was accepted to the Oscar Mayer preschool program for the Fall of 2020, expressed a desire to enroll M.S., and asked for Joshua's input. Joshua requested additional information from Lisa so he could make an informed decision. A few days later, on June 8, Joshua sent Lisa a message "generally agreeing" to M.S. attending Oscar Mayer, asking additional questions, and noting that he was concerned about M.S. not having

consistency. Joshua eventually agreed because Lisa "ruined" M.S.'s chances of staying at CCC. He did acknowledge that Oscar Mayer was a good school.

¶ 65    On or around July 3, 2020, Lisa provided Joshua with a copy of an enrollment form for Oscar Mayer, dated July 3, 2020, which listed Lisa's address as one within the neighborhood. To his knowledge Lisa had not lived at that address and did not move into the neighborhood until the end of July. Lisa has now taken over the administrative tasks. On cross-examination, Joshua testified that he never asked Lisa why she used that specific address, that parties both agreed to enroll M.S. at Oscar Mayer, and that Lisa primarily communicates with Oscar Mayer and forwards him the communications.

¶ 66    Joshua testified to his own unsuccessful attempts to achieve M.S.'s admission to a magnet school. In the fall of 2018, Joshua filled out applications for M.S. to attend Chicago magnet schools, but M.S. was not accepted. In the fall of 2019, when the parties moved out of the martial residence, Joshua moved into a "specific neighborhood that had a better school" and filled out applications for "several schools" through the Chicago magnet program.

¶ 67    Joshua's concerns about Lisa's alcohol consumption were based only on his observations of empty wine glasses and bottles. Since living apart, he does not have any first-hand knowledge of Lisa consuming alcohol. Joshua decided not to continue the investigation when the GAL told him he would need to hire a professional.

¶ 68    On questioning by Lisa, Joshua testified that contrary to the report he and Lisa never agreed to give M.S. a Hebrew name. Joshua responded "yes" when asked if he discussed the topic with the GAL and that he told her that he desired to do so. Joshua recalled discussing giving M.S. a Hebrew name with Lisa when M.S. was younger, and that Lisa did not object. He attended M.S.'s baptism in the Catholic Church. Joshua does not have plans to convert from Judaism to

Catholicism or to convert M.S. to Judaism. Joshua wants to expose M.S. to the Jewish faith and Lisa is in agreement.

¶ 69    In further examination by Lisa, Joshua stated that he uses the social media platform, Instagram. He posts photographs of M.S. to share photos with his family and friends a couple of times a month.

¶ 70    Joshua intends to stay in the city of Chicago for "the indefinite future, but [he] cannot say for certain that will be through [M.S.'s] high school [years]."

¶ 71                                5. Lisa's Testimony

¶ 72    Joshua called Lisa to testify, and she testified on her own behalf.

¶ 73    Lisa sought sole decision-making responsibility with regard to religion and joint decision-making responsibility regarding education, extracurricular activities, and healthcare. If the parties could not agree, Lisa sought the final decision.

¶ 74    Lisa believed the GAL to be biased against her. Lisa acknowledged that she questioned the GAL about her background in Hebrew studies and living in Israel in order to address the GAL's possible religious bias. According to Lisa, the GAL did not respond to a number of her communications. Lisa expressed concerns that the GAL did not attempt to validate any "antidotes" with her prior to writing the report. After receiving the report, Lisa learned of a "religious decision" as to M.S. that had not been discussed with her by either Joshua or the GAL. Lisa did not ban Joshua's mother from the marital home as was stated in the report.

¶ 75    During the investigation, the GAL failed to look into any of the concerns Lisa raised and took every concern raised by Joshua as fact. On questioning from Joshua, Lisa answered in the affirmative that her allegations against Joshua were not relevant for purposes of determining parenting time and decision-making responsibilities.

¶ 76 From early September 2017 through April 2018, Joshua "moved out" of their home and was sleeping at his office and only came home one to two times a week. On questioning from Joshua, Lisa agreed that he did not rent an apartment and did not bring furniture, but he brought clothing and bedding.

¶ 77 While the parties had shared decision-making authority, Joshua went to meetings with Rubin and the GAL without her knowledge.

¶ 78 At some point Joshua stopped discussions with Lisa about whether M.S. should stay in preschool for one more year or move up to kindergarten. Lisa ultimately chose to "keep the peace" and M.S. was enrolled in preschool at Oscar Mayer.

¶ 79 Lisa acknowledged that she filled out the Oscar Mayer application without discussing it with Joshua and used an address within the district to increase M.S.'s chances of getting into Oscar Mayer. Lisa did not live at the address she put on the application materials and the enrollment form but moved into the neighborhood shortly after M.S.'s acceptance.

¶ 80 Lisa would, ideally, like to move out of Chicago in two years, but she has no concrete plans to move or to take M.S. out of Oscar Mayer. She had previously considered moving to Wilmette or Glenview, about nine miles from where she was living during trial. She felt this location would work for both her and Joshua as he has family in the northern suburbs. Lisa was waiting to see "how things play out."

¶ 81 Lisa had communicated to Joshua, through OWF, her thoughts on moving to the suburbs. In the fall of 2019, Lisa sent a message to Joshua acknowledging that she had not ruled out the possibility of moving prior to M.S.'s "pre-K year." In October 2019, Lisa sent a message to Joshua explaining that she did not approve of the class sizes in some of the Chicago Public Schools. She addressed a concern that if M.S. did not move up to kindergarten in 2020, there was a possibility

that, if she moved to Glenview, due to M.S.'s birthday so close to the cutoff date, M.S. would be older than her classmates. In the beginning of December 2019, Lisa again addressed moving M.S. up to kindergarten and expressed that she wanted to move to the suburbs with M.S. so she could have a "childhood that includes riding her bike and being a kid in ways you can't in the city." At the end of December 2019, Lisa noted that moving to the suburbs would allow M.S. to go to school with classmates that "she'll go to school with for many years." In February 2020, Lisa reiterated a desire to move to the suburbs. On cross-examination, Lisa testified that, just prior to the start of trial, she expressed a desire to move after completing the MBA program at the University of Chicago Booth School of Business, which she began in August 2020.

¶ 82    After filing for divorce, she noticed that Joshua began posting photos of M.S. on social media and she was not comfortable with it. Lisa asked him to limit his posts; he did not. Lisa took a screenshot of Joshua's posts and brought it to a mediation, and he cut off her access to his posts.

¶ 83    Prior to their separation and up to the time of trial, Lisa had one to two alcoholic drinks a couple of times a month when she sees her family. When they were still living together, Lisa hid bottles of wine in her closet, so they did not disappear in the communal space. At the time, Joshua did not have a direct conversation with her about her alcohol use.

¶ 84    At the close of evidence, the parties submitted written closing arguments and proposed judgment orders.[3]

¶ 85    On March 26, 2021, the court entered an allocation judgment and parenting plan. The court recited the GAL's recommendations and the parties' respective requests. The court found that Lisa was willing to compromise and that Joshua's attempt to "frame" Lisa as indifferent or neglectful

---

[3] The proposed judgment orders are not part of the record on appeal.

was a "disingenuous representation of Lisa's testimony." The court found that Joshua's arguments associated with Lisa's desire to eventually move to the suburbs were lessened as Joshua admitted that he did not know if he planned to stay in the city. The court further found that Lisa's desire to move to the suburbs was based on the best interest of M.S. and in finding a good school system and a place where M.S. could make lasting friendships and have good childhood experiences. The court found Lisa's actions to reflect that she was a "concerned parent," and that Joshua's characterizations of Lisa's lack of involvement in M.S.'s education as "misleading." The court, in discussing the time period that Joshua slept at his office, found Lisa credible and that Joshua spent every night away from the marital residence and that Joshua's testimony that he always came home for the evening routine was "untrue."

¶ 86    In discussing Lisa's views that the GAL was biased against her, the trial court rejected Joshua's argument that Lisa's claims were solely motivated by a religious bias. The court found that Lisa's views were more about the GAL's failure to look into Lisa's contentions during the investigation. The court also rejected the GAL's characterization of Lisa as a "woman who dismissed the GAL's suggestions," and found her to be "a mother who does not automatically follow other person's suggestions" and one that "considers her child's needs, abilities, and future and then considers the suggestions, and does what she feels is best for the child."

¶ 87    The court ordered equal parenting time and allocated Lisa sole decision-making responsibility regarding education and religion decisions and ordered Lisa to give prior "sufficient notice to Joshua, in writing, to allow him a reasonable amount of time to inquire and provide input" and allocated joint decision-making responsibility regarding extracurricular activities and healthcare decisions.

¶ 88 On March 26, 2021, the court also entered a judgment for dissolution of marriage. The issue of child support was not resolved, and the court set a date for further proceedings on that issue.

¶ 89                                    II. ANALYSIS

¶ 90                                    A. Jurisdiction

¶ 91 We have an independent duty to consider our jurisdiction and dismiss an appeal where our appellate jurisdiction is lacking. *In re Marriage of Salviola*, 2020 IL App (1st) 182185, ¶ 36 (citing *Palmolive Tower Condominiums, LLC v. Simon*, 409 Ill App. 3d 539, 542 (2011)). In the jurisdiction statement of Joshua's appellate brief, Joshua contends that this court has jurisdiction over his appeal from the allocation judgment and the dissolution judgment under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Illinois Supreme Court Rule 303 (eff. Jul. 1, 2017). Lisa does not address jurisdiction in her brief on appeal.

¶ 92 Rule 301 allows appeals from final judgments as a matter of right. *In re Rogan M.*, 2014 IL App (1st) 132765, ¶ 9. A judgment is final when it disposes of the litigation or some definite part of it. *Id.* (citing *In re Adoption of Ginnell*, 316 Ill. App. 3d 789, 793 (2000)). "[G]enerally only a judgment that does not reserve any issues for later determination is final and appealable." *In re Marriage of Susman*, 2012 IL App (1st) 112068, ¶ 13. Absent a supreme court rule exception, this court is without jurisdiction to review non-final judgments, orders, or decrees. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 26.

¶ 93 Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) provides:

"If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims

only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both."

In applying Rule 304(a) our supreme court "has drawn a clear distinction between judgments that dispose of 'separate, unrelated claims' which are immediately appealable under Rule 304(a), and orders that dispose only of 'separate issues relating to the *same* claim,' which are not immediately appealable under Rule 304(a)." (Emphasis in original.) *Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 15 (quoting *In re Marriage of Leopando*, 96 Ill. 2d 114, 119 (1983)).

¶ 94    In dissolution proceedings, a petition for dissolution advances a single claim, and issues such as maintenance, property division, child support, and attorney's fees are all ancillary issues related to that claim, and orders resolving individual ancillary issues generally are not appealable until the court resolves the entire dissolution claim. *In re Marriage of Mackin*, 391 Ill. App. 3d 518, 520 (2009) (citing *Leopando*, 96 Ill. 2d at 118-20). However, Rule 304(b)(6), adopted in 2010, allows for the immediate appeal from any "custody or allocation of parental responsibilities judgment or modification of such judgment entered pursuant to the [(IMDMA)] [citation] ***," without the findings required under Rule 304(a). *In re Marriage of Harris*, 2015 IL App (2d) 140616, ¶¶ 15-16 (citing Ill. S. Ct. R. 304(b)(6) (eff. Feb. 26, 2010)). "[U]nder the IMDMA, an allocation of parental responsibilities judgment is a judgment that allocates 'both parenting time and significant decision-making responsibilities with respect to a child." *Fatkin*, 2019 IL 123602, ¶ 29 (citing 750 ILCS 5/600(b), (d) (West 2016)).

¶ 95    In this case, the dissolution judgment was not final and appealable where it explicitly reserved ruling on the child support issues, ordered Joshua to submit an updated accounting, and set the issue for a new court date. The dissolution judgment did not resolve the entire claim raised by the petitions for dissolution. Therefore, we do not have jurisdiction to decide the financial issues

associated with the dissolution judgment, which Joshua asserts on appeal under Illinois Supreme Court Rule 303 (eff. Jul. 1, 2017). An appeal under Rule 304(a) was not available even if the trial court had made the required findings. *Susman*, 2012 IL App (1st) 112068, ¶ 16 (citing *Leopando*, 96 Ill. 2d at 119). And the financial issues raised in Joshua's appeal from the dissolution judgment did not fall within the parameters of Illinois Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016).

¶ 96 Because we lack jurisdiction over the dissolution judgment, we must dismiss the appeal as to that judgment.

¶ 97 However, the allocation judgment determined all of the issues relating to parenting time and significant decision-making responsibilities with regard to M.S. and was entered pursuant to the IMDMA. Therefore, under Illinois Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016), we do have jurisdiction to decide Joshua's challenges to the allocations of decision-making responsibility, as set forth in the allocation judgment. We will proceed to consider the merits of those arguments.

¶ 98                    B. Allocation of Parental Decision-Making Responsibility

¶ 99 On appeal, Joshua argues that the trial court's determinations as to allocation of sole decision-making responsibility to Lisa with respect to M.S.'s education and religion and joint decision-making responsibility with respect to M.S.'s extracurricular activities and healthcare decisions were against the manifest weight of the evidence. He further argues that it is in the best interest of M.S. that he be allocated sole decision-making responsibility for all significant issues.

¶ 100 A trial court "shall allocate decision-making responsibilities according to the child's best interest." 750 ILCS 5/602.5(a) (West 2020). "Those significant issues shall include, without limitation" education, health, religion, and extracurricular activities. *Id.* § 602.5(b) (1-4). The court

must consider all of the relevant factors, including the factors enumerated in section 602.5(c) of the IMDMA. *Id.* § 602.5(c). The factors enumerated in section 602.5(c) are:

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that my affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

* * *

(15) any other factor that the court expressly finds to be relevant." *Id.*

The trial court is not required to make explicit findings as to each factor. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47.

¶ 101   We will uphold a trial court's ruling on the allocation of decision-making responsibility unless that decision is against the manifest weight of the evidence. *Id*. (citing *Young v Herman*, 2018 IL App (4th) 170001, ¶ 64). " 'A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Williams*, 2020 IL App (3d) 20048, ¶ 47 (citing *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51). It is not a small burden to show that a trial court's ruling is against the manifest weight of the evidence. *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25. Under this standard, we may affirm the trial court's ruling if there is any basis in the record to support its finding. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 102   Further, the trial court is in the best position to evaluate the credibility of the witnesses. *Williams*, 2020 IL App (3d) 200048, ¶ 50 (citing *Young*, 2018 IL App (4th) 170001, ¶ 64). This court does not reweigh evidence or assess the witnesses' credibility. *Williams*, 2020 IL App (3d) 200048, ¶ 51 (citing *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992)).

¶ 103   As an initial observation it is clear that the trial court thoroughly evaluated the evidence and the issues in coming to its allocation determinations. In the allocation judgment order, the trial court stated that it had reviewed the evidence and all of the relevant statutes; gave a detailed analysis of several of the section 602.5(c) factors; reviewed the GAL's recommendations; and summarized the parties' testimony. After hearing six days of testimony, the trial court found Lisa credible, and that the GAL's and Joshua's descriptions of Lisa were inconsistent with Lisa's testimony, explanations, and actions. We find we have no reason to overrule the trial court's finding of Lisa's credibility. *Williams*, 2020 IL App (3d) 200048, ¶ 50-51.

¶ 104   We first consider Joshua's challenge to the trial court's determination that it was in M.S.'s best interest to award Lisa sole decision-making responsibility for religion with prior written notice to Joshua.

¶ 105   Joshua and Lisa agreed that M.S. would be raised in the Catholic faith, Lisa's religion. M.S. was baptized in the Catholic Church, which Joshua attended. Joshua, who is Jewish, does not intend to convert to Catholicism or have M.S. convert to Judaism. However, Lisa has no objection to M.S. learning about the Jewish faith and has not expressed an objection to giving M.S. a Hebrew name. Therefore, we find it is not against the manifest weight of the evidence that the trial court determined that Lisa should have sole decision-making responsibility regarding religion.

¶ 106   Next, we consider Joshua's argument that the court erred in allocating sole decision-making responsibility to Lisa as to education with prior written notice to Joshua.

¶ 107   Lisa and Joshua had disagreements over education decisions, including whether M.S. would continue at the Gardner School and later at CCC and whether M.S. was going to stay in preschool for one more year or move up to kindergarten. Lisa believed that M.S. did not enjoy her time at CCC and would be bored because CCC was providing more daycare services than academic services. If M.S. remained in preschool, Lisa was concerned about M.S.'s future with classmates who would be younger than her and that her education needed to advance.

¶ 108   Joshua and the GAL thought that Joshua was better at school communications. However, Joshua acknowledged that he would contact and meet with CCC school personnel without including Lisa. Rubin also testified that she and Joshua had meetings without Lisa. Rubin also acknowledged that Lisa communicated with CCC as to important decisions regarding M.S. Although Joshua had valid reasons to keep M.S. in preschool, he was willing to have CCC make the decision based on the best interests of M.S.

¶ 109   Any perception that Lisa appeared to be less involved with the CCC community may be explained by her belief that CCC was not the best place for M.S. and was not a stimulating environment. Since enrolling M.S. at Oscar Mayer, Lisa has become the main point of contact for Oscar Mayer and has taken over the administrative tasks for educational decisions. According to Joshua, Lisa includes him on communications with Oscar Mayer.

¶ 110   Joshua argues that the trial court omitted the evidence of "Lisa's unilateral decision to secretly enroll M.S. in a new school before trial and Lisa's misrepresenting her residency on the school application to accomplish same." The allocation judgment specifically mentions that Lisa is the one who found the Oscar Mayer school in order to place M.S. in a more challenging academic environment. That the trial court did not mention the other circumstances surrounding M.S.'s admission to the school does not mean the court overlooked this evidence. Further Joshua's description of what took place is not entirely accurate.

¶ 111   In filling out the application, Lisa was not committing M.S. to attending Oscar Mayer without Joshua's input but was opening up an opportunity for M.S. to do so. Lisa did not apply for a kindergarten class, but rather for another year of preschool as Joshua had requested. Once M.S. was accepted and before enrolling her, Lisa contacted Joshua and sought his input. They both agreed to enroll M.S. at Oscar Mayer, which Joshua admits is a good magnet school. Joshua himself had previously applied to various magnet schools but without success. The fact that Lisa used a false address in the vicinity of the school to increase M.S.'s chances to be accepted does not weigh in her favor. This fact alone does not outweigh the other evidence which supports the court's allocation of sole decision-making responsibility to Lisa particularly in light of the fact that Lisa did move into the neighborhood before M.S. began school.

¶ 112   The evidence as a whole demonstrates Lisa's concern for M.S.'s education path and that she has now taken on the administrative and communication tasks relating to M.S.'s education. We conclude that the trial court's decision as to the issue was neither arbitrary nor unreasonable and is supported by the record. The trial court's decision to award Lisa sole decision-making responsibility for education with prior written notice to Joshua is not against the manifest weight of the evidence.

¶ 113   We turn to the trial court's determination to grant the parties' joint decision-making responsibility as to healthcare decisions.

¶ 114   The evidence shows that both parties were concerned for M.S.'s medical needs and kept each other informed as to M.S.'s medical appointments and issues. Joshua scheduled M.S.'s medical appointments and both parties usually attended the appointments. More recently, Lisa took M.S. to the emergency room when M.S. broke her arm. There was no evidence of disagreements or problems in communications in this area which would make joint decision making difficult. We find that the allocation of joint decision-making responsibility as to healthcare decisions was not against the manifest weight of the evidence.

¶ 115   Finally, we address Joshua's claim that the determination to allocate joint decision-making responsibility as to extracurricular activities was against the manifest weight of the evidence.

¶ 116   The evidence shows that both parties were involved in M.S.'s activities. Joshua and Lisa both signed M.S. up for and attended various activities. Neither Joshua nor Lisa reported disagreements or communication problems about M.S.'s pursuits. We find that the trial court's determination to award joint decision-making responsibility for extracurricular activities was not against the manifest weight of the evidence.

¶ 117   Joshua argues that the trial court erred in not adopting any of the GAL's recommendations and improperly gave weight to Lisa's claim that the report was influenced by religious bias.

¶ 118   A GAL is the "eyes and the ears" of the court and the trial court should consider and give some weight to a GAL's recommendations. *In re Marriage of Wycoff*, 266 Ill. App. 408, 415-16 (1994). The trial court, however, is not bound by a GAL's recommendations. *Taylor v. Starkey*, 20 Ill. App. 3d 630, 634 (1974). Here the trial court was free to accept or reject some or all of the GAL's advice and there was sufficient evidence, as described above, to support the trial court's allocations as to decision making.

¶ 119   The trial court's determinations of the allocation of decision-making responsibilities did differ from the recommendations of the GAL. As for healthcare, the GAL recommended that for routine matters the parties have joint-decision making responsibility and as to non-routine matters that the parties consult and if they cannot agree that Joshua make the decision. The trial court awarded joint decision-making responsibility for all healthcare decisions and thus did not differ drastically from the GAL's recommendations. As to extracurricular activities, the GAL recommended that the parties consult, and that Joshua have the final say if the parties do not agree. The trial court awarded joint decision-making responsibility without granting either party the final decision. Again, this decision was not significantly different from the GAL's recommendation.

¶ 120   As for education and religion, the trial court granted Lisa sole decision-making authority, which differed from the GAL's recommendation for Lisa and Joshua to have joint decision-making responsibility in regard to religion and for Lisa and Joshua to consult as to education, but that Joshua have the final say if the parties do not agree.

¶ 121   However, the trial court had the benefit of hearing the sworn testimony of the parties and the GAL and had more information than the GAL had for the report. The GAL's investigation

ended in March 2020 and did not include what had taken place after that date. In the time period since the report was completed, it was decided that M.S. would stay in preschool but move to Oscar Mayer, a well-regarded magnet school. Lisa moved close to the school, took over the administrative tasks, and became the primary contact for the school. Further, trial testimony revealed that the report inaccurately stated that Lisa and Joshua had already agreed to give M.S. a Hebrew name. Lisa testified that the GAL did not ask her whether this decision had been made.

¶ 122   Additionally, the trial court disagreed with the GAL's descriptions of Lisa. The court specifically stated that it

> "did not see Lisa as she was described in the GAL's report. Rather than a woman who 'dismissed the GAL's suggestions,' Lisa appeared to be a mother who does not automatically follow other person's suggestions. Lisa appears to this Court, as reflected in her testimony and explanations, as a mother who considers her child's needs, abilities, and future, and then considers suggestions, and does what she feels is best for the child. Both Joshua and the GAL may disagree with her, but this Court cannot say that Lisa has an inability to cooperate and place the child's needs first. Her actions reflect the contrary."

¶ 123   Also contrary to Joshua's argument, the trial court did not find that the GAL held a religious bias. Instead, the trial court made reference to Lisa's claim that the GAL was biased against her and rejected Joshua's argument that Lisa's claim was based only on the fact that Joshua and the GAL shared a religion. The court found Lisa had made specific assertions that the GAL during her investigation had failed to look into Lisa's concerns and had accepted Joshua's versions of events.

¶ 124   Joshua in essence wants us to reweigh the evidence, including the report, and find that he should have sole decision-making responsibility as to all significant issues, a result which was not recommended by the GAL. This we cannot do. As noted above, on review, we will not reweigh

the evidence or assess the credibility of the witnesses. *Williams*, 2020 IL App 20048, ¶ 51 ("It is well settled that a reviewing court's function is not to reweigh the evidence or assess the witness credibility and set aside the [trial] court's decision simply because a different conclusion may have been drawn from the evidence.").

¶ 125 In summary, we conclude that the trial court's allocations of decision-making responsibility were not against the manifest weight of the evidence and were in M.S.'s best interest.

¶ 126                                        III. CONCLUSION

¶ 127 We dismiss that portion of the appeal relating to the dissolution judgment and affirm the allocation judgment.

¶ 128 Affirmed in part and dismissed in part.