**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220174-U

Order filed October 31, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| IN RE MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| JOYCE RABBAT, | ) | Du Page County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-22-0174 |
| and | ) | Circuit No. 19-D-940 |
| | ) | |
| GORAN TOPALO, | ) | The Honorable |
| | ) | Kenton J. Skarin, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Holdridge and Justice Peterson concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*: In dissolution action, trial court did not err in (1) awarding mother sole religious decision-making responsibilities where she and father agreed she would take the lead on religion, or (2) granting mother slightly more parenting time, including Sundays and religious holidays, where she is more actively involved in child's religious upbringing.

¶ 2      Petitioner Joyce Rabbat and respondent Goran Topalo were married in 2017, had a son, J.T., in 2018, and began dissolution proceedings in 2019. In 2021, the trial court entered a judgment

of dissolution but reserved issues of parenting time and allocation of parental responsibilities. Following hearings on those issues, the trial court entered an order (1) allocating decision-making responsibilities to both parents with respect to significant educational, medical and extracurricular decisions involving J.T., (2) allocating sole religious decision-making responsibilities to Joyce, (3) designating Joyce as the parent with the majority of the parenting time, and (4) granting Goran parenting time with J.T. three nights and three days per week. Goran appeals, arguing that the trial court erred in granting Joyce sole religious decision-making responsibilities and allocating to her the majority of parenting time, including Sundays and religious holidays. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Joyce Rabbat and Goran Topalo were married on July 29, 2017, at an Eastern Rite Catholic church. On July 6, 2018, Joyce and Goran had a son, J.T. On May 22, 2019, Joyce filed a petition for dissolution of marriage. On June 6, 2019, Goran filed a petition for establishment of temporary parenting time and appointment of a guardian *ad litem* (GAL). On June 13, 2019, the trial court appointed Chuck Roberts as GAL. On August 20, 2019, the trial court appointed Dr. Robert Shapiro to perform mental health evaluations of Joyce and Goran, pursuant to Illinois Supreme Court Rule 215(a) (eff. Jan. 1, 2018). The court also granted Goran temporary parenting time.

¶ 5        On November 13, 2019, the trial court entered an order granting Goran parenting time with J.T. every Tuesday from 7:30 am to 11 am, every Thursday from 7 pm to Friday at 7 pm, and every Sunday from 1:30 pm to 7 pm. On January 21, 2020, the trial court entered a modified parenting schedule granting Goran parenting time with J.T. every other week from Thursday at 7 pm to Sunday at 9 am, and on alternating weeks from Monday at 7 pm to Tuesday at 11 am and Thursday at 7 pm to Friday at 11 am.

¶ 6    On February 25, 2020, the trial court appointed Roger Hatcher as an evaluator, pursuant to section 604.10(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604.10(b) (West 2020)). On April 15, 2020, Goran filed a counter-petition for dissolution of marriage. On September 30, 2020, the trial court entered an order appointing Gerald Blechman as Joyce's evaluator, pursuant to section 604.10(c) of the Act (*id*. § 604.10(c)). The court also modified the parenting schedule to provide Goran parenting time with J.T. every week from Monday at 7 pm to Tuesday at 11 am and alternating weeks from Thursday at 7 pm to Friday at 2 pm or Thursday at 7 pm to Sunday at 9 am.

¶ 7    On December 2, 2021, the parties signed a marital settlement agreement (MSA). On December 8, 2021, the trial court entered a judgment for dissolution of marriage incorporating the MSA and reserving issues involving the child.

¶ 8    The trial on the remaining issues was held over six days in December 2022. Chuck Roberts, the GAL, testified that Joyce lives in Oak Brook and is a medical doctor, and Goran lives in Elmhurst and works as a dentist. Roberts met the families of each parent. According to Roberts, Goran's parents said nothing negative about Joyce, while Joyce's brother and mother had many negative things to say about Goran.

¶ 9    Roberts recommended that Goran and Joyce equally share parenting time by having J.T. reside with each of them for one week at a time and have one mid-week dinner with the other parent. He said he recommended a 50/50 parenting schedule "[t]o make sure that neither side has the ability to exclude the importance, significance and impact of the other parent." Roberts also recommended that the parents have joint decision-making in all areas to "make sure that neither side is able to exclude the other side." Roberts testified that he had concerns about Joyce's willingness to foster a relationship between J.T. and Goran.

¶ 10      Roberts testified that at the time of trial, Goran's parenting time was scheduled to end on Sundays at 9 am so that J.T. could attend church with Joyce every Sunday. Roberts testified that "religion is more of a priority for Joyce than it is for Goran." Roberts recommended: "Going forward both parties should be allowed to celebrate their faith in whatever manner they deem appropriate." Roberts stated he was "concerned that [J.T.] has not been baptized at this point."

¶ 11      Dr. Robert Hatcher, a clinical psychologist who has performed "well over a thousand" court-ordered evaluations, testified and drafted two reports, which were admitted into evidence. Dr. Hatcher met with both parents individually five or six times. He determined that neither had any psychological or psychiatric problems that warranted diagnosis or treatment.

¶ 12      Dr. Hatcher observed each parent with J.T. and found they both interacted well with him and that J.T. seemed very comfortable with both parents. Dr. Hatcher administered two psychological tests to the parties and concluded: "[B]oth parents were competent and fully capable of making decisions for the child and working together in a joint parenting relationship."

¶ 13      Dr. Hatcher recommended that Joyce and Goran share decision-making responsibilities. Dr. Hatcher recommended that Goran have parenting time with J.T. Thursday to Sunday in alternating weeks and Thursday to Friday in opposing weeks, as well as every Tuesday morning. He recommended that once J.T. reaches five years of age, he should spend alternate weeks with each parent with perhaps a brief mid-week visit with the other parent.

¶ 14      With respect to religion, Dr. Hatcher noted "no significant difference" between Goran and Joyce. He stated: "They're both Catholic. One is in the Eastern Rite. The other is Orthodox. But there was nothing *** that would oppose their cooperation on religious training for this child, and they both agree this child would be raised in the Catholic tradition." Dr. Hatcher stated that the parties agreed that Joyce would "take the lead on religion" both during and after the marriage.

4

¶ 15 Dr. Robert Shapiro testified that he interviewed and administered psychological tests to both parties, spoke to the parties' friends and family, and communicated with the GAL. After that, he completed his report, which was admitted into evidence. In his report, Dr. Shapiro stated: "[C]ounsel and the court should be aware that the [parties'] respective personality features in their marital history are poor predictors of successful future co-parenting."

¶ 16 Based on his interviews with the parties, Dr. Shapiro learned that Joyce and Goran "were from strikingly different backgrounds" and had conflicts about what church they would attend. Based on his testing, Dr. Shapiro determined that Goran had a temporary adjustment disorder with features of paranoia and histrionic but concluded that neither party suffered from any significant psychological disorder.

¶ 17 Dr. Gregory Blechman, Joyce's expert, testified that he reviewed the reports of Dr. Shapiro and Dr. Hatcher, met with the parties and J.T., reviewed the parties' test results and talked to family members and friends of the parties. Dr. Blechman described Joyce as very sincere, forthcoming and credible. Based on his observations of her with J.T., she is "a good mother."

¶ 18 Dr. Blechman described Goran as "very friendly" but also "rather obsequious." According to Dr. Blechman, Goran "took no responsibility whatsoever for any of the problems that [J.T.] was having" and "was very angry and rejecting of Joyce." Dr. Blechman found that Goran has a personality pattern that "combines narcissism, histrionic behavior, and paranoia."

¶ 19 Dr. Blechman recommended that Joyce have sole decision-making responsibilities for medical, education, religious and extracurricular issues and recommended joint decision-making for dental issues. With respect to parenting time, Dr. Blechman believed Joyce "should be the major residential parent" with Goran having parenting time every other weekend from Friday to Sunday and perhaps one overnight visit during the week.

¶ 20    Dr. Blechman provided the court his report in which he discussed several of the statutory best interest factors contained in section 602.5 of the Act (750 ILCS 5/602.5 (West 2020)). When addressing the ability of Goran and Joyce to cooperate in making decisions, Dr. Blechman wrote: "This evaluation revealed the parents have never been able to cooperate." In his report, Dr. Blechman expressed "concerns about Goran's willingness to nurture a relationship with [J.T.]'s mother."

¶ 21    Goran testified that he is a partner in a dental practice and works Monday through Thursday and Saturday mornings from September to May. He and Joyce live within 15 minutes of each other. Goran described J.T. as very well-behaved and "very clever." He testified that when J.T. is with him, his bedtime "varies," explaining it can be as late as 9 pm.

¶ 22    Goran denied that he and Joyce ever disagreed about religion. He testified that he is a practicing Orthodox Christian but does not attend church regularly and has not attended an Orthodox church in years. Goran admitted that J.T. has not yet been baptized. Goran said he did not object to J.T. being baptized but did not necessarily agree that J.T. should be baptized at Joyce's church. He thought he and Joyce should "compromise" and baptize J.T. at the church where he and Joyce were married.

¶ 23    Goran testified that he does not believe Joyce keeps him informed about J.T. but admitted Joyce informs him about J.T.'s appointments, health and naps. He agreed with GAL Roberts's and Dr. Hatcher's parenting time recommendations and said he wants "equal parenting time."

¶ 24    Joyce's mother, Reine Rabbat, testified that Joyce is "a great mom and great doctor." She described J.T. as a "[v]ery lovable grandchild." Reine watches J.T. while his parents are at work. She testified that after visitation with Goran, J.T. seems tired, "very irritable" and naps more often than usual.

¶ 25    Joyce testified that she works at Loyola University Medical Center on Mondays, Wednesdays and Thursdays. She described J.T. as "very sweet" and "very loving." She testified that her Arabic heritage is important to her. Her religion is Eastern Rite Catholic, which is a blend of Catholicism and eastern traditions. She belongs to St. John the Baptist Church in Northlake. She was married in a Catholic church in Chicago, and her priests from St. John officiated the wedding. Joyce would like J.T. to be baptized at St. John because it is the church she attends.

¶ 26    Joyce testified that she and Goran had conflicts during their marriage about her religion and Arabic heritage. She said Goran told her he did not want J.T. to learn Arabic or call her mother "Teta," the Arabic word for grandmother.

¶ 27    Joyce testified that she shares information with Goran about J.T.'s meals, naps, health and appointments. At her house, J.T. goes to bed "around 8 pm." Joyce said she would like final decision-making authority for J.T. with respect to religion, education, medical and extracurricular activities.

¶ 28    On January 3, 2022, the trial court entered a parenting allocation plan and order. The court's order stated in part:

"G.     The court heard testimony from both parties, the guardian ad litem (Chuck Roberts), a court-appointed Rule 215 expert (Dr. Robert Shapiro), a court-appointed Section 604.10(b) expert (Dr. Roger Hatcher), a Section 604.10(c) expert for Mother (Dr. Gerald Blechman), Mother's brother (Mark Rabbat), Mother's mother (Reine Rabbat), a family friend of Mother (William Haddad), and a business associate of Father (Dr. Frank Bernero);

H.      During that trial, the court had the opportunity to observe the testimony, demeanor, and credibility of the parties and other witnesses and to weigh the evidence now

7

before the court. Upon full consideration of all the relevant evidence along with the arguments of counsel and after consideration of the relevant statutory factors set forth in Section 602.5 and Section 602.7 of the [Act], it is now in the best interests of the child to resolve all remaining disputed issues as set forth in this order.

I. The court finds that neither party has overcome the presumption that 'both parents are fit.' *See* 750 ILCS 5/602.7(b). Further, the court affirmatively finds that both FATHER and MOTHER are fit parents."

¶ 29 The court ordered that (1) both parties make all significant educational, medical and extra-curricular decisions together, after consultation with one another, and (2) Joyce make all significant religious decisions. The court designated Joyce as the parent with the majority of the parenting time and granted Goran parenting time with J.T. on alternating weeks from Sunday at 6 pm to Wednesday at 6 pm and Wednesday at 6 pm to Saturday at 6 pm. The court also granted parenting time to the parties in alternate years for New Year's Day, Memorial Day, Labor Day, July 4th, Halloween, Thanksgiving and the day after, Christmas Eve and Christmas and granted Joyce parenting time with J.T. every year on Good Friday and Easter. The court also awarded each party two non-consecutive weeks of vacation with J.T.

¶ 30 Joyce filed a motion to reconsider and/or clarify the court's order, and Goran filed a motion to reconsider the order. On April 1, 2022, the trial court entered an order (1) granting in part and denying in part Joyce's motion by clarifying that vacation weeks must be scheduled between Memorial Day and Labor Day, and (2) denying Goran's motion.

¶ 31 II. ANALYSIS

¶ 32 A. Religious Decision-Making Responsibilities

8

¶ 33    Goran first argues that the trial court erred in granting Joyce sole religious decision-making responsibilities. He contends, in part, that the trial court failed to specify which best-interest factors weighed in favor of its decision.

¶ 34    Section 602.5(a) of the Act provides: "The court shall allocate decision-making responsibilities according to the child's best interests." 750 ILCS 5/602.5(a) (West 2020). When determining the child's best interests for purposes of allocating decision-making responsibilities, the court shall consider all relevant factors including:

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

9

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." *Id*. § 602.5(c).

¶ 35    The Act contains the following specific provisions for the allocation of decision-making responsibilities for religion:

"(A) The court shall allocate decision-making responsibility for the child's religious upbringing in accordance with any express or implied agreement between the parents.

(B) The court shall consider evidence of the parents' past conduct as to the child's religious upbringing in allocating decision-making responsibilities consistent with demonstrated past conduct in the absence of an express or implied agreement between the parents.

(C) The court shall not allocate any aspect of the child's religious upbringing if it determines that the parents do not or did not have an express or implied agreement for such religious upbringing or that there is insufficient evidence to demonstrate a course of conduct regarding the child's religious upbringing that could serve as a basis for any such order." *Id*. § 602.5(b)(3).

¶ 36    A reviewing court will not disturb a circuit court's ruling on the allocation of decision-making responsibilities unless that decision is against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47 "A decision is against the manifest weight

10

of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence." *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51. The circuit court is not required to make explicit findings on each statutory best interest factor, nor is it required to refer to every statutory factor. *Jameson*, 2020 IL App (3d) 200048, ¶ 47.

¶ 37    "It is no small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence." *Id*. ¶ 50. "[T]here is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child." *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25. "It is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence." *Jameson*, 2020 IL App (3d) 200048, ¶ 50 (citing *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992)).

¶ 38    Here, there was ample evidence to support the trial court's decision to grant Joyce sole religious decision-making responsibilities. First, the parties had an implied agreement that Joyce would "take the lead" with respect to religious matters both before and after the marriage, as Dr. Hatcher stated. Dr. Hatcher further concluded that the parties agreed to raise J.T. in the Catholic faith. As GAL Roberts testified, "religion is more of a priority for Joyce than it is for Goran." The evidence established that Joyce belongs to an Eastern Rite Catholic church and attends regularly, while Goran is an Orthodox Christian and has not attended church in years.

¶ 39    Additionally, the past conduct of the parties supports the trial court's decision. The parties were married in an Eastern Rite Catholic church with priests from Joyce's church officiating. Goran testified that he assumed J.T. would be baptized in that same church, which was a church

11

of Joyce's religion. The prior parenting time orders entered by the court consistently granted Joyce parenting time on Sundays so she could take J.T. to church.

¶ 40 Furthermore, evidence supported the trial court's decision to designate one parent as the sole decision-maker with respect to religion. While Goran denied that he and Joyce had disagreements over religion, Joyce testified that they did, and Dr. Shapiro agreed. Goran admitted J.T. has not yet been baptized because he and Joyce cannot agree on where the baptism will take place. In light of the parties' current and past religious disagreements, it was reasonable for the trial court to designate one parent as the sole decisionmaker with respect to religion.

¶ 41 Despite Goran's contentions otherwise, the trial court was not required to make specific findings to support its award of religious decision-making responsibilities to Joyce. Nothing in section 602.5 or any other provision of the Act requires the court to state the reasons for its decision. See 750 ILCS 5/602.5 (West 2020). Furthermore, case law establishes that a trial court is not required to make explicit findings with respect to the statutory best interest factors set forth in section 602.5(c) of the Act. See *Jameson,* 2020 IL App (3d) 200048, ¶ 47.

¶ 42 Nevertheless, here, the trial court not only specifically mentioned the Act but also specifically mentioned section 602.5 of the Act and stated that it considered all the relevant statutory factors to determine the best interests of the child. We must presume the trial court did what it said it did. See *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 18 (presuming trial court "properly considered all statutory factors" where it stated it considered "all evidence" which included GAL's report that analyzed all the statutory factors). Because there is evidence supporting the trial court's decision, we affirm its award of sole religious decision-making responsibilities to Joyce.

¶ 43 B. Parenting Time

¶ 44    Goran also contends that the trial court erred in allocating to Joyce the majority of parenting time and failing to grant him parenting time on Sundays, Easter, Good Friday and Father's Day.

¶ 45    Pursuant to the Act, a circuit court must allocate parenting time according to the best interests of the child. 750 ILCS 5/602.7(a) (West 2020). In arriving at that decision, the court must consider all relevant factors, including:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

13

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; ***

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b).

¶ 46     "Because the trial court is in the best position to assess the credibility of witnesses and determine the child's best interests, its decision regarding the allocation of parenting time must be accorded great deference." *Whitehead*, 2018 IL App (5th) 170380, ¶ 15 (citing *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 45). "We will not overturn the trial court's decision unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *Id.*

¶ 47     "Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. "Generally, we presume that a trial court knows

14

the law and follows it accordingly." *Id*. The lack of any explicit mention of factors by the court "is insufficient to overcome the presumption that the trial court knew and followed the law." *Id*. ¶ 44. A reviewing court may presume that the trial court properly considered all statutory factors. *Id*.

¶ 48 Here, the court's allocation of parenting time, which provided Goran with only slightly less than the "equal parenting time" he requested. In this case, the trial court awarded Goran parenting time with J.T. on alternating weeks from Sunday at 6 pm to Wednesday at 6 pm and Wednesday at 6 pm to Saturday at 6 pm, giving him three days and three nights of parenting time each week. While that is slightly less than what Roberts recommended, it is more than what Dr. Hatcher recommended and much more than what Dr. Blechman recommended. The trial court's nearly equal allocation of parenting time was not against the manifest weight of the evidence.

¶ 49 Goran specifically contends that the trial court erred by failing to award him parenting time on Sundays, Easter, Good Friday and Father's Day. We disagree.

¶ 50 The evidence established that Joyce has always had parenting time with J.T. on Sundays so she can take J.T. to church. Thus, the court granting Joyce parenting time on Sundays was consistent with the parties' past practices as well as the trial court's allocation of religious decision-making to Joyce. The evidence also supports the trial court's decision to have Joyce's parenting time start on Saturday nights, instead of Sunday mornings, to ensure that J.T. will be well rested for church. The evidence showed that J.T.'s bedtime at Goran's house is often later than at Joyce's, which according to Reine, causes J.T. to be tired and irritable on the mornings after he stays with Goran. To avoid J.T. being tired and irritable at church on Sundays, it was reasonable for the court to end Goran's parenting time with J.T. on Saturday evenings. Additionally, based on the trial court's allocation of religion decision-making to Joyce, it was reasonable for the trial court to grant Joyce parenting time with J.T. on the religious holidays of Good Friday and Easter. Finally,

15

because Father's Day is on Sunday when J.T. participates in religious activities with Joyce, the court did not allocate that holiday to Goran. While we are empathetic towards Goran's argument regarding Father's Day, we cannot find that the court's allocation was an abuse of discretion or against the manifest weight of the evidence. See *Whitehead*, 2018 IL App (5th) 170380, ¶ 41. We affirm the trial court's allocation of parenting time.

¶ 51                                    III. CONCLUSION

¶ 52        The judgment of the circuit court of Du Page County is affirmed.

¶ 53        Affirmed.